**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PASQUALE J. GUERRIERO,<br><br>          Plaintiff,<br><br>v.<br><br>DIOCESE OF BROOKLYN,<br>SHRINE CHURCH OF ST.<br>BERNADETTE<br><br>          Defendants. | **AMENDED COMPLAINT AND JURY DEMAND**<br><br>1:21-cv-04923-MKB-JRC |

Plaintiff, Pasquale J. Guerriero, by and through his undersigned counsel, alleges the following:

## NATURE OF CLAIM

1.    This case is brought under the New York Child Victims Act (L 2019, ch 11) ("CVA"). It concerns the repeated acts of sexual abuse committed by Fr. Nicholas J. Capua ("Father Capua") of the Shrine Church of St. Bernadette ("St. Bernadette") and Diocese of Brooklyn against Plaintiff Pasquale Guerriero ("Plaintiff" or "Pasquale") who was a minor at the times of the sexual abuse alleged herein.

2.    These acts include conduct by Father Capua that would constitute a sexual offense as defined by, *inter alia,* New York Penal Law §§ 130.55, 130.80(l)(a), and 130.65(4).

3.    The sexual abuse Plaintiff was subjected to includes touching, kissing, groping, squeezing, and penetration.

4.    Upon information and belief, Father Capua was employed as a priest at St. Bernadette during the 1960's when the abuse detailed herein occurred.

5.     Over the course of approximately seven (7) years, beginning in 1962, Father Capua sexually abused Plaintiff, a vulnerable elementary aged boy, in the basement of the Shrine Church of St. Bernadette.

6.     Father Capua regularly called Pasquale out of class, fed him wine, and forced him to undress.

7.     Father Capua then proceeded to molest Plaintiff in the most horrific ways imaginable using his position of power to exploit Plaintiff and the sanctity of his body.

8.     Upon information and belief, Defendants' leaders, employees, and agents—including the Bishop of Brooklyn—were on notice Father Capua was a sexual predator since at least 1961, a year before Father Capua began sexually molesting Pasquale.[1]

9.     No action was taken to stop Father Capua—to the contrary, the Bishop of Brooklyn covered up the allegations of sexual abuse against Father Capua, thereby emboldening him to molest other children.

10.     Father Capua was transferred from his first assigned parish (St. Alphonsus) to another parish in Brooklyn (St. Bernadette's) in 1961, where Father Capua was given unrestricted access to minor students and parishioners, including Pasquale.[2]

11.     Pasquale was a foreseeable victim.

12.     In 2007, Father Capua was placed on leave without privileges after the Diocese of Brooklyn deemed allegations that he had abused several minors.

13.     Father Capua was thereafter removed from ministry; he is listed on the Diocese of Brooklyn's 2019 "List of Diocesan Clergy for Whom the Diocese Received Allegations of Sexual

---

[1] *See* Father Capua's employment file from St. Bernadette, attached hereto as Exhibit 1.

[2] *Id.*

Misconduct With A Minor"—specifically as one of the "Clergy Members of the Diocese of Brooklyn with Credible Allegations."

14.     Defendants' agents and employees—including the Bishop of Brooklyn, Reverend Monsignor Francis P. Barilla, and Sister Immaculate[3]—knew, or had reason to know, Father Capua was sexually abusing minors, including Pasquale, but they failed to take any action to prevent Pasquale from further abuse.

15.     Accordingly, Plaintiff files suit against all Defendants for (1) negligence, (2) negligent training/supervision/retention, (3) gross negligence, (4) premises liability, and (5) breach of fiduciary duty.

## PARTIES

16.     Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth.

17.     At the time of the sexual abuse herein, Plaintiff, was a minor residing in the state of New York. Plaintiff currently resides in the State of North Carolina.

18.     Defendant the Diocese of Brooklyn was, and continues to be, a religious organization and a non-profit religious corporation duly organized and existing under, and pursuant to, the laws of the State of New York, and authorized to conduct business and conducting business in the State of New York, with its principal place of business at 310 Prospect Park West, Brooklyn, New York.

19.     Defendant the Shrine Church of St. Bernadette was, and continues to be, a religious entity within the Diocese of Brooklyn, which operates both a parish and a school, with its principal place of business at 8201 13th Avenue, Brooklyn, New York.

---

[3] Upon information and belief, Sister Immaculate's legal name is Mackie Goone, and she has since left the Church and is no longer a nun. Ms. Goone is alive and resides in Connecticut; Plaintiff will move to depose Ms. Goone as soon as feasible.

## JURISDICTION AND VENUE

20.     Plaintiff incorporates all consistent paragraphs of this Complaint fully set forth herein.

21.     Plaintiff brings this complaint under 28 U.S.C. § 1332 as Plaintiff is a resident of North Carolina, and the amount in controversy exceeds $75,000.

22.     Defendants maintain their principal places of business in New York.

23.     Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because Defendants maintain their principal place of business within this District.

## FACTS COMMON TO ALL COUNTS

24.     Defendants employed Father Capua as a priest at St. Bernadette and used altar boys—including Plaintiff—for morning mass, confession, and sacramental rites.

25.     Defendant St. Bernadette held itself out to be a religious institution of learning, where students, including minor Plaintiff, would be safe.

26.     Defendants owned and operated St. Bernadette and employed priests, including Father Capua, as educators and spiritual guides.

**Defendants knew Father Capua was a sexual predator but gave him unrestricted access to children in Brooklyn for over forty years, until he was removed from ministry in 2007.**

27.     Father Capua was ordained by the Diocese of Brooklyn and assigned to St. Alphonsus in 1956.

28.     Upon information and belief, in 1961, Father Capua requested a transfer from St. Alphonsus to another parish.[4]

---

[4] *See* Exhibit 1.

29.     Whether a priest can be transferred from one parish to another is determined by the diocese's bishop, as instructed by a series of "canons," or "ecclesiastical legal principles."[5]

30.     According to Cannon 1740, a diocesan bishop can remove a priest from his assigned parish if the priest's ministry becomes "harmful" or "ineffective."[6]

31.     Cannon 1741 states, "[t]he causes for which a pastor can be removed legitimately from his parish are especially the following:"

> 1/ a manner of acting which brings grave detriment or disturbance to ecclesiastical communion;

> 2/ ineptitude or a permanent infirmity of mind or body which renders the pastor unable to fulfill his functions usefully;

> 3/ loss of a good reputation among upright and responsible parishioners or an aversion to the pastor which it appears will not cease in a brief time;

> 4/ grave neglect or violation of parochial duties which persists after a warning;

> 5/ poor administration of temporal affairs with grave damage to the Church whenever another remedy to this harm cannot be found.[7]

---

[5] The canon law of the Catholic Church is "how the Church organizes and governs herself." It is the system of laws and ecclesiastical legal principles made and enforced by the hierarchical authorities of the Catholic Church to regulate its external organization and government and to order and direct the activities of Catholics toward the mission of the Church. *See* Father James Goodwin, "Church Teaching. Introduction to Canon Law," *Simply Catholic* (retrieved April 1, 2022, available at https://www.simplycatholic.com/introduction-to-canon-law/).

[6] CODE OF CANNON LAW, SECTION II, THE PROCEDURE IN THE REMOVAL OR TRANSFER OF PASTORS, Cannons 1740 - 1752, (retrieved April 1, 2022, available at: https://www.vatican.va/archive/cod-iuris-canonici/eng/documents/cic_lib7-cann1732-1752_en.html#).

[7] *Id.; see also:* THE MANNER OF PROCEEDING IN THE TRANSFER OF PASTORS.

Can. 1748 If the good of souls or the necessity or advantage of the Church demands that a pastor be transferred from a parish which he is governing usefully to another parish or another office, the bishop is to propose the transfer to him in writing and persuade him to consent to it out of love of God and souls.

Can. 1749 If the pastor does not intend to submit to the counsel and persuasions of the bishop, he is to explain the reasons in writing.

32.     Upon information and belief, Father Capua requested a transfer from St. Alphonsus in 1961 because abuse allegations against him surfaced, and, upon receiving this request, the bishop immediately granted his transfer, assigning Father Capua to assist Reverend Monsignor Francis P. Barilla's at. St. Bernadette.[8]

33.     Upon information and belief, Father Capua requested a transfer from St. Bernadette, which was granted by the Archbishop of Brooklyn, and Father Capua was assigned to another parish in Brooklyn (St. Thomas Aquinas).[9]

34.     Father Capua was transferred to four different parishes in Brooklyn before he was permanently removed from ministry in 2007.

**<u>Defendants gave Father Capua, a known predator, unrestricted access to Pasquale—who he began molesting when Pasquale was a second-grade student at St. Bernadette.</u>**

35.     Father Capua began abusing Pasquale when he was in second grade and approximately seven (7) years old.

---

Can. 1750 Notwithstanding the reasons alleged, if the bishop decides not to withdraw from his proposal, he is to consider the reasons which favor or oppose the transfer with two pastors selected according to the norm of can. 1742, §1. If he then decides to implement the transfer, however, he is to repeat the paternal exhortations to the pastor.

Can. 1751 §1. When this has been done, if the pastor still refuses and the bishop thinks that the transfer must be made, he is to issue a decree of transfer, establishing that the parish will be vacant after the lapse of a set time.

§2. If this period of time has passed without action, he is to declare the parish vacant.

Can. 1752 In cases of transfer the prescripts of can. 1747 are to be applied, canonical equity is to be observed, and the salvation of souls, which must always be the supreme law in the Church, is to be kept before one's eyes. *Id.*

[8] *See* Exhibit 1.

[9] *Id.*

36.     Pasquale remembers vestibule which had a window that overlooked the school yard where the students played ball.

37.     Fr. Capua would come out to the yard and tell the boys he needed an altar boy to help serve, and then, often select Pasquale to assist him.

38.     Once inside the vestibule, Fr. Capua would tell Pasquale to look out the window at the other students playing, and Fr. Capua would come up behind Pasquale and rub against him.

39.     Father Capua sexually abused Pasquale on a weekly basis, approximately once to twice per week, in the basement of St. Bernadette throughout the 1960's while Pasquale was a student and altar boy at St. Bernadette.

40.     Upon information and belief, Defendants knew the amount of, and type of time Pasquale spent alone with Father Capua, Father Capua's unrestricted access to Pasquale, and Father Capua's ability to molest Pasquale.

41.     Upon information and belief, throughout the time Father Capua sexually abused Pasquale, Defendants' agents and employees—including Reverend Monsignor Francis P. Barilla and Sister Immaculate—suspected the abuse that was occurring, because Plaintiff would be pulled from class and taken to Father Capua; instead of helping Plaintiff, they took no action and allowed the abuse to continue and intensify.

42.     During the 1960's, sexual abuse in Catholic institutions, including both churches and schools was well known but commonly hidden from the public, parents, and parishioners.

43.     Defendants are vicariously liable for the acts of Father Capua through the doctrine of *respondeat superior*, in addition to direct liability described here and below.

44.     As a direct and proximate result of Defendants' acts, omissions, negligence, gross negligence, and conduct described herein, Pasquale sustained injuries to his person and

property—including, but not limited to, great pain of mind and body, shock, mental anguish, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, anger, rage, frustration, loss of enjoyment of life, loss of consortium, loss of love and affection, sexual dysfunction, past and future medical expenses for psychological treatment, therapy, and counseling, lost wages and employment opportunities, lost choses in action, and other compensation to which he was entitled.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
**Against All Defendants**

45.　Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

46.　The allegations of fact and law above evidence St. Bernadette had a special relationship and duty to intervene and protect Plaintiff consistent with the Restatement of Torts (Second), sec. 314 (A)(4) and sec. 320; and as more particularly described above regarding a person or entity who has exclusive custody or control of a minor.

47.　At all relevant times herein, Defendants held their institutions out to be safe places for religious worship, spiritual development, and growth, learning and education, and engaging in youth and/or community activities.

48.　Defendants explicitly and implicitly represented to Plaintiff, his parents, and the community, that all of its educators and staff members, including Father Capua, were benevolent and trustworthy stewards of the faith who would only act in the best interests of the children whom they served and granted Father Capua unfettered access to the minor children attending the school, including Plaintiff.

49.     Defendants had and/or assumed a duty to provide a reasonably safe environment for Plaintiff and assumed the duty to protect and care for him.

50.     Pursuant to common law and the Restatement (Second) of Agency, § 219, Father Capua was acting as the agent of Defendants because while engaging in the wrongful acts with Plaintiff, Father Capua was in the course and scope of his employment acting as a priest and educator of Plaintiff and with Defendants; and/or was able to accomplish the sexual abuse because of his job-created authority and role as an agent of the Defendants.

51.     As such, Defendants are vicariously liable for the acts of Father Capua through the doctrine of *respondeat superior*, in addition to their direct liability described here.

52.     Defendants knew, or should have known, that there was an unreasonable risk of harm to children at St. Bernadette, like Pasquale, to whom Father Capua was provided access by Defendant.

53.     Defendants knew that the Catholic schools and the Roman Catholic Church generally, had a long history of employees and/or agents who had sexually molested children.

54.     Defendants created a foreseeable risk of harm to Plaintiff.

55.     As a minor child being educated at St. Bernadette and participating in the programs and activities Defendants offered to minors, Plaintiff was a foreseeable victim.

56.     As a minor child who Father Capua had access to through Defendants' school, facilities, and programs and who looked at Father Capua as a priest and person of authority, Plaintiff was a foreseeable victim.

57.     Defendants owed a duty of care to all minor persons, including Plaintiff, who were likely to come within the influence or supervision of Father Capua in his role as priest, employee, agent, and/or servant.

58.     Pursuant to Restatement (Second) of Torts, § 317, Defendants had a duty, as master of Father Capua, to exercise reasonable care to control Father Capua while he was on Defendants' premises, that is, St. Bernadette, and accompanying grounds, even when acting outside the scope of their employment, to prevent Father Capua from intentionally harming others, including Plaintiff.

59.     Defendants accepted responsibility for well-being of Plaintiff as a minor child.

60.     As such, Defendants had a duty to provide the type of care required of one who requests to be entrusted with the responsibility of caring for children.

61.     Defendants owed duties to Plaintiff arising from the relationship akin to that of a student-school, and/or parishioner-priest, and thus, Defendants were required and obligated to protect the children on the tutelage, including Plaintiff.

62.     Such duties include, but are not limited to, a duty to provide safe care, custody, and control of minor children, including Plaintiff, a duty to warn or and report to the proper authorities the deviant propensities of Father Capua, and ultimately to prevent sexual, physical, and mental abuse of all minors within their care, control and/or custody, including Plaintiff.

63.     Father Capua's forcible sexual acts on Plaintiff sere performed in the course and scope of his delegated duties and authorities granted by Defendant.

64.     Defendants, its agents, employees, servants, and licensees, including vicariously through employee, Father Capua, breached its duties of care owed to Plaintiff, including, *inter alia*:

    a.      failing to investigate the background and/or history of Father Capua before placing him into close contact with minors, including, Plaintiff;

    b.      failing to remove Father Capua from ministry and allowing him unrestricted access to minors, including Plaintiff, even after allegations of sexual abuse were

known to the bishop and Defendants' agents and employees, including Reverend Monsignor Francis P. Barilla, and Sister Immaculate;

c.      failing to warn Plaintiff, his parents and/or legal guardians, of Father Capua's conduct and/or the reasonably foreseeable risk of future harm, despite Defendants having actual or constructive knowledge of Father Capua sexually abusing children, having the propensity to sexually abuse children, and/or posing as a threat of abuse to children;

d.      permitting and/or directing Father Capua to have private contact with minor Plaintiff despite having constructive or actual knowledge of Father Capua sexually abusing children, and/or posing as a threat of sexual abuse to children;

e.      minimizing, ignoring, and/or excusing the misconduct of Father Capua as described herein, which allowed such conduct to continue;

f.      covering up allegations of child sexual abuse and emboldening Father Capua and other priests to molest children in Brooklyn by granting transfers from parish to parish;

g.      failing to provide a safe environment to Plaintiff within the schools, churches, and rectories that they operated and/or owned;

h.      failing to conduct a reasonable investigation of abuse complaints;

i.      failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to identify and/or prevent the sexual abuse of children;

j.      failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to prevent Father Capua's sexual abuse of Plaintiff; and

k.     failing to exercise reasonable care to control Father Capua to prevent his sexual abuse of Plaintiff while on Defendants' premises.

65.     In the above ways, amongst others, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercise under similar circumstances thereby breaching its duties owed to Plaintiff.

66.     As a direct and proximate result of the above mentioned breaches of duty by Defendants and its agents, servants, workers, or employees  and/or others, including but not limited to Father Capua, for whose acts or omissions they are responsible, and those whose identities  are in the exclusive control of Defendants, Plaintiff experienced and suffered from sexual abuse at the hands of Father Capua, as well as the ensuing physical mental, and financial injuries and damages discussed herein, which Plaintiff still continues to suffer.

67.     As a direct and proximate result of Defendants' foregoing acts and omissions, as described herein, Plaintiff sustained both physical and emotional injuries, including, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame; loss of faith and mistrust of the education system, school, teachers, coaches, the Roman Catholic Church, and their agents and institutions; injuries suffered at the time of the sexual abuse including physical shock to the nervous system and emotional distress; pain and suffering; severe mental anguish and trauma, necessitating psychiatric and medical care and treatment in the past, present and/or in the future; physical ailments, including, but not limited to headaches, nausea, mental anguish, anxiety and loss of sleep; loss of earnings and earning capacity during those periods. Plaintiff was unable to unable to sustain a previous marriage as a result of the abuse, and grievous bodily pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

68.    Defendants' acts and omissions were a foreseeable, direct, and proximate cause of the occurrence of Plaintiff's resulting injuries and damages therefrom.

69.    By reason of the foregoing, Plaintiff is entitled to recover all of his damages from Defendants.

**SECOND CAUSE OF ACTION**
**NEGLIGENT TRAINING/SUPERVISION/RETENTION**
**Against All Defendants**

70.    Plaintiff incorporates all consistent paragraphs of this Complain as if fully set forth under this count.

71.    Father Capua was employed by Defendants and under Defendants' direct supervision, employ, and control when he committed the wrongful acts alleged herein. Father Capua engaged in the wrongful conduct while acting in the course and scope of his employment with St. Bernadette and/or accomplished the sexual abuse by virtue of his job-created authority.

72.    Defendants, through their employees and agents, had a duty arising from their employment of Father Capua, to ensure that he did not sexually molest and abuse children in their care and/or on their premises.

73.    Defendants owed a duty to train and educate employees and administrators and establish adequate and effective policies and procedures calculated to detect, prevents, and address inappropriate behavior and conduct between their employees and the children under their care.

74.    Defendants breached their duties to instruct, train and supervise their employees, in that Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, including, *inter alia*:

a. Failing to timely and properly education, train, supervise, and/or monitor their gents or employees with regard to policies and procedures that should be followed when sexual abuse of a child is suspected or observed;

b. failing to timely and properly educate, train, supervise, and/or monitor their agents or employees with regard to policies and procedures that should be followed to detect and/or prevent sexual abuse of a child;

c. failing to supervise, monitor, and/or investigate Father Capua in his interactions with children when Defendant knew or should have known that such supervision was necessary;

d. failing to train employees on rules, policies, procedures, and/or regulations to prevent Father Capua's sexual abuse of Plaintiff;

e. failing to properly supervise Father Capua such that the opportunity for repeated, unfettered private access to Plaintiff would not be available; and

f. failing to take reasonable steps to remove Father Capua from the types of duties and circumstances which allowed him the opportunity to continue sexually abusing minors, including Plaintiff.

75. Defendants breached their legal duty of care owed to Plaintiff as a student of St. Bernadette.

76. Defendants breached their duty in failing to adequately evaluate, and qualify Father Capua, both pre- and post-hiring, and failed to monitor, supervise influence, control, discipline, or discharge Father Capua and/or report Father Capua to criminal authorities and/or parents or otherwise restrict his movement and/or activities to ensure the safety of the children at St. Bernadette, specifically Plaintiff, in the ways discussed herein.

77.     Defendants and their agents and/or employees, knew, or should have known of Father Capua's deviant sexual proclivities, propensities and/or criminal misconduct prior to employing or placing Father Capua in positions of trust with minors.

78.     Unfortunately, Defendants placed and maintained Father Capua in positions of trust and control with access to children, which ultimately led Father Capua to access and harm Plaintiff.

79.     Defendants, after placing Father Capua, and with suspected knowledge of the abuse, negligently retained Father Capua in a position where he had access to children and could foreseeably cause harm which Plaintiff would not have been subjected to had defendants exercised reasonable care.

80.     In failing to timely remove Father Capua from working with children, Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar care.

81.     As a direct and proximate result of the foregoing acts and omissions by Defendants, Plaintiff sustained both physical and emotional injuries, including, humiliation, embarrassment, loss of self-esteem, disgrace, guilt and shame; loss of faith and mistrust of the education system, school, teachers, priests, the Roman Catholic Church and their agents and institutions; injuries suffered at the time of the sexual abuse including physical shock to the nervous system and emotional distress; pain and suffering; severe mental anguish and trauma, necessitating psychological and medical care and treatment in the past, present and/or in the future; and grievous bodily pain and suffering, mental anguish, inconvenience and loss of enjoyment of life.

82.     Defendants' acts and omissions were a foreseeable, direct, and proximate cause of the occurrence and Plaintiffs resulting injuries and damages therefrom.

83.     By reason of the foregoing, Plaintiff is entitled to recover all of his damages from Defendants.

### THIRD CAUSE OF ACTION
### GROSS NEGLIGENCE
**Against All Defendants**

84.     Plaintiff incorporates all consistent paragraph of this Complaint as if fully set forth herein.

85.     Defendants' acts and omissions, as previously described, were committed with reckless disregard for, and with willful, wanton, and conscious indifference to, the rights, safety, and welfare of Plaintiff and the general public.

86.     The nature of Defendants' aforesaid wrongful acts and omissions were of such a nature as to constitute gross negligence and malice.

87.     Defendants undertook a continuous course of action in the form of conscious decisions, with subjective knowledge and awareness of the risks and hazards presented by each decision as discussed above and incorporated herein, to expose Plaintiff and others to sexual abuse and/or sexual assault by Father Capua, and without exercising slight care or diligence.

88.     Defendants had a duty to exercise reasonable care in relation to the safety and welfare of their minor students, including Plaintiff.

89.     Defendants had a duty to exercise reasonable care and avoid creating and maintaining unreasonable risks to the safety and welfare of the children enrolled in their school, including Plaintiff.

90.     Defendants had a duty to exercise reasonable care in investigating and pursuing suspicions of criminal conduct, sexual misconduct, and violations of law against the children enrolled in their school, including Plaintiff.

91.     In addition to the common law duty of ordinary care discussed above, and incorporated herein, Defendants had a duty that arose because of, *inter alia*, a special relationship between the school and the minor students attending the school.

92.     St. Bernadette agreed to educate, care for, and keep safe the minor students in exchange for tuition, for which Defendants accepted to fund and promote their school and initiatives.

93.     Defendants breached their duty of care by acting with reckless disregard for the safety and welfare of Plaintiff and other innocent children by failing to properly investigate and report the suspected and tolerated pedophile activities of their educators/priests, including those of Father Capua, and by placing its own person interest in front of the safety of the children enrolled in their school, including Plaintiff.

94.     Defendants were more concerned with their reputations than protecting children, including Plaintiff. Such conduct was, and is, wanton and willful, reckless, and conscious disregard for the safety of innocent children, including Plaintiff.

95.     Defendants' foregoing acts and omissions, involved reckless disregard of or indifference to an extreme degree of mental, and psychological risk and danger, considering the probability and magnitude of the potential a harm to others.

96.     Defendants' foregoing gross negligence was foreseeable, direct, and proximate cause of the occurrence and Plaintiff's injuries and damages therefrom.

97.     As a direct and proximate result of the Defendants' acts and omissions, Plaintiff suffered sexual abuse at the hands of Father Capua, as well as ensuing physical, mental, and financial injuries and damages discussed herein, which Plaintiff still continues to suffer.

98.     That by reason of the foregoing, Plaintiff is entitled to recover all of his damages from Defendants.

99.    As a direct and proximate result of such violations, Plaintiff suffered the injuries and damages described herein.

## FOURTH CAUSE OF ACTION
## PREMISES LIABILITY
### Against All Defendants

100.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth.

101.    At all relevant times, Defendants owned and occupied the school/church property upon which the assaults on Plaintiff occurred.

102.    Further, Defendants controlled the school/church premises where Plaintiff was assaulted.

103.    At all relevant times, Plaintiff was an invitee at the school/church premises where he was assaulted.

104.    Defendants provided inadequate security and supervision over the premises despite the existence of unreasonable risk of harm from abusive personnel at the school/church.

105.    The risk of harm was foreseeable, and Defendants knew or had reason to know that abuse of minors would occur given previous abuse, proximity of other abuse, the recency of other abuse, frequency of abuse, the similarity of other abuse, and their actual knowledge of this abuse by teachers, priests, and other personnel at Roman Catholic schools and churches.

106.    The above acts or omissions by Defendants were a proximate cause of Plaintiff's injuries and the resulting damages Plaintiff seeks in this suit.

## FIFTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### Against All Defendants

107.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth.

108.    At all relevant times, Plaintiff had a special relationship with Defendants arising from his attending the Defendants' school and participating as an altar boy in the Defendants' church.

109. Plaintiff was a minor at all relevant times and Defendants were acting *in loco parentis* in charge of Plaintiff's well-being.

110. This relationship was rooted in a moral, social, religious, or personal relationship of trust and confidence between the Plaintiff and Defendants.

111. Defendants had a dominance over Plaintiff who was reliant on Defendants' control and Plaintiff reasonably relied on Defendants to act in his best interest.

112. This special relationship gave rise to a fiduciary relationship.

113. Further, at all relevant times, Plaintiff had a special relationship with Defendants arising from their status as an education and religious institution.

114. Entrusted with special privileges and immunities, Defendants demanded complete loyalty, fealty, and trust from individuals like Pasquale and specifically instructed individuals like Plaintiff such that they are granted with special power to determine right and wrong.

115. This extreme power imbalance mandates that Plaintiff place an extreme degree of trust and confidence in Defendants to act as "the shepherd" and determine what is in his best interest.

116. This psychological power over Plaintiff caused him to justifiably and indeed mandated that he relies on the commands of Defendants, by and through its teachers, coaches, nuns, and priests.

117. Given the existence of their status as a fiduciary over Plaintiff, Defendants owed Plaintiff the highest duty of care at law, including but not limited to: (1) duty of loyalty and utmost good faith; (2) duty of candor; and (3) duty to act with integrity of the strictest kind; and (4) duty of full disclosure.

118. Defendants breached their fiduciary duties by, among others, hiding and keeping secret the fact that there were persons at the school to whom Plaintiff would be subjected that engaged in sexual abuse of minors, by failing to disclose both before and after the events at issue in this case

Defendants' knowledge of the abuse and the abuser, failing to disclose the policy of covering-up past incidents of abuse, and putting the interest of Defendants ahead of students and victims like Pasquale by continuing to this day to hide the full extent of the problem.

119. These breaches cause harm to Plaintiff and benefitted Defendants who sought to protects its reputation from public knowledge of the rampant misconduct occurring at its school/church.

120. The above acts or omissions by these Defendants were a proximate cause of Plaintiff's injuries and the resulting damages Plaintiff seeks in this suit. Plaintiff prays that, following a verdict, all such damages be awarded against Defendants.

## DAMAGES

121. As a direct and proximate result of the foregoing acts and/or omissions of Defendants, Plaintiff suffered the injuries and damages described herein.

   a.    Past, present and future conscious pain and suffering;

   b.    Past, present and future mental anguish, and emotional distress;

   c.    Past, present and future medical expenses;

   d.    Compensatory damages;

   e.    Punitive damages;

   f.    Litigation costs, expenses, and reasonable and necessary attorney fees;

   g.    Litigation costs, expenses, and reasonable and necessary attorney fees;

   h.    Pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and

   i.    Any and all other damages to which Plaintiff may be justly entitled.

## PRAYER FOR RELIEF AND JURY DEMAND

122.    **WHEREFORE,** based on the foregoing causes of action, Plaintiff demands judgment against Defendants in an amount to be determined in a trial by jury; for a sum that will fully and fairly compensate Plaintiff for his injuries and conscious pain and suffering, that Plaintiff recovers actual damages; that Plaintiff is entitled to recover compensatory damages; that Plaintiff recovers punitive damages; together with litigation costs, expenses and reasonable and necessary attorneys' fees, pre-judgment and post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law or statute; and any and all other relief to which Plaintiff may be justly entitled.

123.    Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

*/s/ Ashley M. Pileika*
Ashley M. Pileika
New York Bar No. 974605

Darren Wolf*
Texas State Bar No. 24072430
**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
P: 214-346-5355 | F: 214-346-5909
darren@darrenwolf.com
*Admitted *pro hac vice*

### CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2022, I electronically transmitted the attached document to the Clerk's Office using the ECF System for e-filing and transmittal of a Notice of Electronic Filing to the ECF registrants on record in this matter.

/s/ Ashley M. Pileika
Ashley M. Pileika