**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

PASQUALE GUERRIERO,

               Plaintiff,

v.                                                                              **1:21-cv-04923-MKB-JRC**

DIOCESE OF BROOKLYN ET AL.,

               Defendants.

 

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

**Law Office of Darren Wolf, P.C.**
Ashley M. Pileika
New York Bar No. 974605
ashley@darrenwolf.com
Darren Wolf
Texas State Bar No. 24072430
darren@darrenwolf.com
1701 N. Market St., Suite 210
Dallas, Texas 75202
P:  214-346-5355
F:  214-346-5909

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT………………………………………………………….2

ARGUMENT……………………………………………………………………...…6

I.     THE SAC DOES NOT RUN AFOUL TO F.R.C.P. 8…………………………….6

II.    ALL OF PLAINTIFF'S CLAIMS ARE WELL-PLEADED AND PREVAIL PAST
       *TWIQBAL'S* PLAUSIBILITY THRESHOLD………………………………………9

       A.  Plaintiff States Claims for Negligence and Gross Negligence………………….10

       B.  Plaintiff States a Claim for Negligent Training/Retention/Supervision…….……....15

       C.  Plaintiff States a Claim for Premises Liability…………….…………………….…..23

       D.  Plaintiff States a Claim for Breach of Fiduciary Duty…………………….………..24

CONCLUSION………………………………………………………………...………25

## PRELIMINARY STATEMENT

Plaintiff Pasquale Guerriero ("Plaintiff" or "Pasquale") submits this Memorandum of Law in opposition to Defendants' Motions to Dismiss the Second Amended Complaint ("SAC"). This case was filed pursuant to the New York Child Victims Act (L 2019, ch 11) ("C.V.A.") for sexual abuse Pasquale was subjected to by Father Nicholas J. Capua ("Father Capua") a priest under the Diocese of Brooklyn ("Diocese") assigned to Shrine Church of St. Bernadette ("St. Bernadette"), beginning in 1962, when Pasquale was a 7-year-old student and parishioner at St. Bernadette. SAC at ¶¶ 1-7.

For approximately six years, Father Capua routinely called Pasquale out of class and off the playground, in plain sight of his teachers and school administrators; brought him to a vestibule area of St. Bernadette with an outward facing window; fed him wine; forced him to undress; and violated his vulnerable young body. *Id.* at ¶¶ 3-7; 41-47.

Defendants do not dispute the horrific nature of the sexual abuse Pasquale was subjected to as a child. Nor do they dispute the fact Father Capua was removed from ministry in 2007 and named to the Diocese's "Credibly Accused" list of "Diocesan Clergy for Whom the Diocese Received Allegations of Sexual Misconduct With A Minor." *Id.* at ¶¶ 14-15.

For decades, Father Capua used his position of power as a priest under the Diocese of Brooklyn to meet, groom, and molest children. Defendants turned a blind eye and facilitated Father Capua's transfer from parish to parish to cover up allegations of child sexual abuse. *Id.* at ¶¶ 8-16. Defendants' leaders, employees, and agents failed to take steps to protect Pasquale and other foreseeable victims from serious injuries at the hands of Father Capua. *Id.* at ¶¶ 59-62.

Defendants' leaders, employees, and agents—including the Bishop of Brooklyn—were on notice Father Capua was a "bad priest" since at least May 20, 1959, when the Bishop of Brooklyn received a letter from a longtime parishioner from St. Alphonsus stating, "[o]ne of the statements

that I hear repeatedly is that Father Capua is a bad priest." *Id*. at ¶¶ 30-34; Exhibit 1 to SAC. The parishioner informed the Bishop, Father Capua "was the first to the side of 13-16 years old boys in a case-very immoral." *Id.* Further, the parishioner, who had attended St. Alphonsus for 23 years, stated she had never seen so many teenagers at the parish, "since Father Capua took over the youngsters." The parishioner offered to give the "names and addresses of those [she] mention[ed] in th[e] letter. *Id*.

Despite actual notice and knowledge Father Capua was a "bad priest" in charge of "youngsters" at St. Alphonsus, Defendants initiated no investigation into these allegations; Defendants did not discipline Father Capua; and Defendants took no action to prevent Father Capua from preying on Pasquale and other foreseeable minor victims; instead, Father Capua's request in 1961 for an immediate transfer from St. Alphonsus to another parish (St. Bernadette) was granted. *Id.* at ¶¶ 34-40; Exhibit 2 to SAC. Father Capua was shuffled between four different parishes before he was removed from ministry in 2007. *Id.*

Upon information and belief, defendants transferred Father Capua from parish to parish after allegations of child sex abuse surfaced against him at each. *Id.* at ¶ 38. Despite being on notice and having actual knowledge Father Capua was a sexual predator by the time Father Capua was transferred to St. Bernadette, Defendants took no action to prevent Pasquale from being sexually abused by Father Capua—allowing Father Capua unrestricted access to Pasquale one to two times a week for six years. *Id.* at ¶¶ 46-47.

To date, Plaintiff has received two limited discovery productions in the form of Father Capua's employment file from St. Alphonsus and St. Bernadette. Both productions have shed light on facts and issues central to the crux of this case—and they highlight why additional discovery is necessary. Defendants' Motions to Dismiss raise factual disputes that should be raised at the close

of discovery in a motion for summary judgment—not prior to the onset of discovery. *See* Plaintiff's combined response to Defendants' pre-motion letters, dkt. # 57.

By way of example, the Diocese states the 1959 letter the Bishop of Brooklyn received from a longtime parishioner "includes no allegations that Capua had engaged in sexual misconduct and says nothing that could have put the Brooklyn Diocese on notice that Capua had a propensity to commit sexual abuse." *See* Diocese of Brooklyn's Motion to Dismiss, at p. 4. Unless Defendants erred in removing Father Capua from ministry and naming him to a list of credibly accused priests/pedophiles, Pasquale submits he does not misconstrue the import of this letter. Defendants agree their agents, employees, and leaders were put on notice and had actual knowledge many parishioners alleged Father Capua was a "bad priest" that "spen[t] most of his time with "young men leaving the seminary" and was "the first to the side of 13-16 year old boys" involved in "immoral" things. These facts (red flags) should be submitted to a jury to make the ultimate determination as to whether Defendants failed to take steps to protect Pasquale and other foreseeable victims from injuries at the hands of Father Capua. *See also* Defendants' pre-motion letters, dkt. # 55-56, and Plaintiff's combined response to Defendants' letter motions, dkt. # 57.

Upon information and belief, Defendants possess Father Capua's "victim file," which contains credible accusations of child sex abuse made against him by other victims. Pasquale has yet to receive this discovery—and any discovery that sheds light on the identities, dates, and abuse allegations of Father Capua's other victims.

Despite having named Father Capua to a list of credibly accused priests/pedophiles, thereby conceding Defendants have relevant discovery in their sole knowledge, control, and possession at this time, which is not available to Plaintiff—Defendants now move to dismiss Plaintiff's SAC in its entirety. The Diocese argues the SAC runs afoul to F.R.C.P. 8 because it alleges "Defendants,"

as opposed to stating "the Diocese of Brooklyn *and* St. Bernadette" throughout. Both Defendants argue Plaintiff has failed to state any claims that survive *Twiqbal's* plausibility requirement.

Plaintiff respectfully requests the Court deny Defendants' Motions to Dismiss and afford Pasquale—a survivor of child sexual abuse, who has suffered silently for many decades—a fair and full opportunity to obtain discovery in this case. As discussed herein, Plaintiff's SAC both comports with F.R.C.P. 8 and states claims for (1) negligence, (2) gross negligence, (3) negligent supervision/retention/hiring, (4) premises liability, and (5) breach of fiduciary duty.

## ARGUMENT

### I.   THE SAC DOES NOT RUN AFOUL TO F.R.C.P. 8.

Uniformly naming two defendants throughout a complaint for their shared wrongdoing, as Plaintiff does here, does not run afoul to F.R.C.P. 8. Even if the Diocese of Brooklyn and St. Bernadette are separate entities, this by no means suggests each entity's liability must be kept "separate" and Defendants cannot be held jointly liable for the abuse described herein. Defendants do not get a free pass because they incorporated St. Bernadette as a separate corporate entity from the Diocese—St. Bernadette is indisputably a religious entity within the Diocese, which operates both a parish and a school.

Though "a complaint must 'give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests,'" there is "[n]othing in Rule 8 [that] prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *New York Am. Water Co., Inc. v. Dow Chem. Co.*, No. 19CV2150NGRLM, 2020 WL 9427226, at *4 (E.D.N.Y. Dec. 11, 2020) (internal citations omitted).

*Bardwil Indus. Inc. v. Kennedy*, the case the Diocese relies on to argue improper group pleadings "is inapposite because [it does] not involve identical allegations against named defendants." *Id.* There, three former officers of a textile company were sued in their individual capacity for self-dealing and a series of wrongful events that led to the company being wound down. *Bardwil Indus. Inc.*, No. 2020 WL 2748248, at *3. "[G]roup pleading failed to distinguish among the conduct of . . . individuals, where the claim, which related to mismanagement of a business, turned specifically on each defendant's distinct duties and actions." *New York Am. Water Co., Inc. v. Dow Chem. Co*., No. 19-CV-2150, 2020 WL 9427226, at *4 (E.D.N.Y. Dec. 11, 2020).[1] *See also Douek v. Citibank*, No. 20-CV-8074, 2021 WL 3604761, at *1 (S.D.N.Y. Aug. 12, 2021) (discussing each defendant in *Bardwil Indus. Inc.* "was 'left to guess not only which factual contentions [were] asserted against him, but also which of those contentions [were] the basis for [the] plaintiff's claims and noting that '[s]uch guesswork is antithetical to the fair notice that Rule 8 requires'").

Defendants also cite *Murray v. Nazareth Reg'l High Sch*., 2022 WL 3139116, at *2 (E.D.N.Y. Aug. 5, 2022), which despite proffering a supplemental filing to this Court in *LaFrantz*

---

[1] Throughout the SAC, Pasquale alleges the Diocese of Brooklyn and St. Bernadette acted in unison and jointly employed and controlled Father Capua and the premises of St. Bernadette and are, therefore, jointly liable.

Compare with the allegations in *Bardwil Indus. Inc.* which describes distinct acts committed by individual defendants but fails to identify **_which defendants_** undertook **_which acts_**. *See, e.g., Bardwil Indus. Inc.*, 2020 WL 2748248, at *3 ("not a single allegation specifies which defendant engaged in what misconduct. Instead, each allegation ambiguously asserts that "[d]efendants" carried out the alleged wrongdoing. For example, . . . "[d]efendants ordered all of the[ ] assets to be moved from the Columbus warehouse," . . . "[d]efendants liquidated the inventory" in the Dallas warehouse, . . . "[d]efendants failed to pay the licensing fees due to Lenox," . . . "[d]efendants orchestrated and participated in moving the License to Arlee," . . . "[d]efendants" "fail[ed] ... to engage an independent auditor," . . . "[d]efendants" did not provide bank statements to Hertz Herson).

*v. Diocese of Brooklyn, et al*. (Docket No. 21-cv-04920-FB-CLP at dkt. #44), it provides little context now. In *Murray v. Nazareth Reg'l High Sch*., the plaintiff claimed he was sexually assaulted by a priest in 1965 at "a Catholic summer camp located in Maryland." No. 20CV1471RJDRML, 2022 WL 3139116, at *1 (E.D.N.Y. Aug. 5, 2022). Two years later, in 1967, the plaintiff alleged, the priest brought him to New York, where the plaintiff was photographed and sexually assaulted again. Notably, the plaintiff did "not describe a single interaction between himself or his parents and any member of the Diocese or claim that he or his parents were aware the priest was affiliated with the Diocese of Brooklyn." *Id*. at *2. Furthermore, the "plaintiff was never an enrolled student in any school or institution within the Diocese, so the Diocese did not have physical custody over him. As such, plaintiff [did] not alleged facts sufficient to suggest that the Diocese owed him a duty of care based on a school-student relationship." *Id*. Given this tenuous connection to the Diocese of Brooklyn, the Court dismissed the plaintiff's claims versus the Diocese of Brooklyn only; the plaintiff's claims versus the two other named defendants—Nazareth High School and the Xaverian Brothers USA—were not dismissed.

Here, Pasquale was introduced to Father Capua at St. Bernadette in Brooklyn, New York, when Pasquale was a 7-year-old student and minor parishioner. SAC at ¶¶ 26-28; 41-45. Pasquale's parents intentionally enrolled their son at St. Bernadette and knew Father Capua was a diocesan priest. *Id*. Further, both St. Bernadette and the Diocese represented Father Capua as a pastor and educator at St. Bernadette, a school and parish under the Diocese's control and supervision. *Id*. In contrast to John Doe, Pasquale has alleged facts that show the Diocese and St. Bernadette owed him a duty of care based on a school-student relationship.

The SAC repeatedly demonstrates Father Capua was under the shared direction, control, employ, and supervision of the Diocese of Brooklyn and St. Bernadette when he sexually abused

Pasquale. The educational facilities and premises of St. Bernadette—where Father Capua was given unfettered access to and repeatedly sexually abused Pasquale—were also under Defendants' shared direction, control, and supervision. Therefore, Pasquale states five viable claims against both the Diocese of Brooklyn and St. Bernadette (i.e., "All Defendants"). *See, id., e.g.*, at ¶¶ 67-68; 77; 82.

## II.     ALL OF PLAINTIFF'S CLAIMS ARE WELL-PLEADED AND PREVAIL PAST *TWIQBAL'S* PLAUSIBILITY THRESHOLD.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *C.Q. v. Est. of Rockefeller*, No. 20-CV-2205, 2021 WL 4942802, at \*2 (S.D.N.Y. Oct. 21, 2021) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011)).

"In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." *Id.* (citing *Kassner v. 2nd Ave. Delicatessen Inc*., 496 F.3d 229, 237 (2d Cir. 2007). Plaintiff's SAC "does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters. Ltd*., 751 F.3d 64, 70 (2d Cir. 2014).

Pasquale has far surpassed *Twiqbal's* plausibility standard and stated claims for (1) negligence, (2) gross negligence, (3) negligent training/supervision/retention, (4) premises liability, and (5) breach of fiduciary duty.

### A. Plaintiff States Claims for Negligence and Gross Negligence.

Plaintiff alleges Defendants—both the Diocese of Brooklyn and St. Bernadette—owned and operated St. Bernadette and employed priests at the school and parish, including Father Capua. SAC at ¶ 28. The SAC also states Father Capua was a diocesan priest—and thereby under the diocese's control, direction, and employ. *Id.* at ¶¶ 28-29. Plaintiff, therefore, has established St. Bernadette is a parish and school within the control, direction, and supervision of the Diocese of Brooklyn. Together, Defendants were charged with operating, controlling, directing, and staffing St. Bernadette—in addition to educating, supervising, and ensuring the safety of St. Bernadette's students. *Id.* at ¶¶ 27, 52-53, 67-68, 79. New York courts have reached this same conclusion—that the Diocese of Brooklyn jointly owns and/or operates schools and parishes—in several other cases. *See, e.g., Caroleo v. Roman Catholic Diocese of Brooklyn,* 2021 NY Slip Op 31445(U) (App. Div. 2nd. 2021); *DiGiorgio v. Roman Catholic Diocese of Brooklyn*, 2021 N.Y. Slip Op. 31378 (N.Y. Sup. Ct. 2021).

The Diocese correctly states "[a]n action for negligence does not lie unless there exists a duty on the part of the defendant and a corresponding right in the plaintiff." *Cohen v. Wales,* 518 N.Y.S.2d 633, 634 (1987). But the Diocese wrongly argues it had no special relationship with Pasquale, and, therefore, owed her no duty to control Father Capua and protect Pasquale from Father Capua's harmful conduct. Both the Diocese and St. Bernadette maintained a special relationship with Pasquale—as a student and an invitee.[2]

---

[2] The Defendants had a fiduciary relationship with Pasquale, discussed in sub-section "D"

First, a school and its educators owe students a duty to "exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances." *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) (quoting *Hoose v. Drumm*, 281 N.Y. 54, 57–58 (1939)); *see also Garcia v. City of N.Y.*, 646 N.Y.S.2d 508, 509 (1st Dep't 1996) ("This duty [of care] derives from the fact that the school, once it takes over physical custody and control of the children, effectively takes the place of their parents and guardians"). It is well settled that "[i]n New York, schools are under a special duty of *in loco parentis,*" *PC-41 Doe v. Poly Prep Country Day Sch.*, 20-CV-03628, 2021 WL 4310891, at *12 (E.D.N.Y. Sept. 22, 2021). Both Defendants, therefore, maintained a "special relationship" with Pasquale and a duty to act *in loco parentis.*

Second, the Diocese St. Bernadette also maintained a special relationship with Pasquale as an invitee on property they owned and operated. SAC at ¶ 109. In *Caroleo v. Roman Catholic Diocese of Brooklyn*, Judge Silver denied the Diocese of Brooklyn's motion to dismiss the negligence claims of a plaintiff who was molested by the dean of St. Francis Preparatory School. 2021 NY Slip Op 31445(U) (App. Div. 2nd. 2021). Judge Silver held the Diocese and the Franciscan Brothers "owed a duty of care to plaintiff because, among other things, plaintiff was an invitee on property that defendants owned and/or operated." *Id*. at *20.

Here, the Diocese of Brooklyn and St. Bernadette breached the duties they owed to Pasquale as a student and invitee by failing to exercise reasonable care to safely manage the priests under their employ, direction, and control tasked with educating St. Bernadette's students and minor parishioners, like Pasquale. SAC at ¶¶ 52, 55, 58, 64, 66-71, 78-80. Defendants knowingly

---

("Plaintiff States a Claim for Breach of Fiduciary Duty"), which created an additional duty to warn, protect, and disclose incidents of sexual abuse to her, which they also breached.

allowed Father Capua—an alleged "bad priest"—unfettered access to an elementary-aged boy once to twice a week for several years. *Id.* at ¶¶ 30, 41-46.

Moreover, in *Caroleo v. Roman Catholic Diocese of Brooklyn*, the Diocese of Brooklyn and the Franciscan Brothers "argue[d] that they had no notice of [the dean's] actions," but Judge Silver held both defendants "failed to conclusively establish their lack of knowledge as a matter of law." *Id.* at *21. As such, Judge Silver allowed plaintiff's negligence claims survive defendants' motions to dismiss noting "[d]iscovery will be necessary before the parties' significant disputes on the issue of notice can be reconciled." *Id.* at *21.

Indeed, in *Ehrens v. Lutheran Church*, the Second Circuit affirmed a district court's grant of summary judgment ***after*** the completion of discovery, where the plaintiff identified no admissible evidence to establish the church had notice of a pastor's proclivities to commit sexual assault, and the incidents were perpetrated at the victim's home and the pastor's home, and not on church property. 385 F.3d 232, 235–36 (2d Cir. 2004). *See also Osvaldo D. v. Rector Church Wardens & Vestrymen of the Par. of Trinity Church of New York*, 834 N.Y.S.2d 94 (2007) (summary judgment granted after the plaintiff "failed to raise a factual issue as to whether, at the time of his hiring, Trinity Church was on notice of facts triggering a duty to inquire further"); *Ige v. Command Sec. Corp.*, No. 99-CV-6916, 2002 WL 720944, at *10 (E.D.N.Y. Mar. 12, 2002) (summary judgment granted after plaintiff could not provide any evidentiary support the employer knew or should have known of the employee's propensity for the injury-causing conduct); *O'Neil v. Roman Cath. Diocese of Brooklyn*, 949 N.Y.S.2d 447, 449 (2012) (summary judgment granted after plaintiff failed to raise a triable issue of fact in opposition to the Diocese defendants showing that they lacked either actual or constructive knowledge of the visiting priest's propensity to engage in discriminatory conduct and, upon learning of his conduct, acted promptly to redress it).

Here, the SAC contains at a number of factual allegations that allow a factfinder to plausibly infer—if not conclude—Defendants had notice of Father Capua propensities and acts, yet took no measures to prevent him from sexually abusing Pasquale once to twice a week for six years:

1. Defendants' employees, agents, and leaders—including the Bishop of Brooklyn—knew as early as 1959, parishioners widely regarded Father Capua as a "bad priest," yet they failed to investigate these allegations. SAC at ¶ 30-34; Exhibit 1 to SAC.

2. Father Capua "was the first to the side of 13-16 years old boys in a case-very immoral." A longtime parishioner at St. Alphonsus stated she had never seen so many teenagers at the parish, "since Father Capua took over the youngsters"—i.e., Father Capua was assigned to work with youth at St. Alphonsus/things did not go so well there. *Id.*

3. Father Capua requested a transfer from St, Alphonsus in 1961 because, upon information and belief, abuse allegations against him surfaced, and upon receiving this request, the Bishop immediately granted his transfer, assigning Father Capua to assist Reverend Monsignor Francis P. Barilla at St. Bernadette. *Id.* at ¶ 38; Exhibit 2 to SAC.

4. Beginning when Pasquale was only in second grade, Father Capua began pulling Pasquale out of class and off the playground—in plain view of Defendants' agents, employees, and leaders—and sexually abused Pasquale in an open vestibule area of St. Bernadette with an outward facing window. *Id.* at ¶¶ 41-47.

5. Although there was suspicion and red flags raised to Defendants' agents, employees, and leaders that Father Capua posed a threat to adolescent boys, Defendants took no action to prevent Pasquale, a foreseeable victim, from sexual abuse at the hands of Father Capua. *Id.*

6. Defendants were aware the amount of time, and type of time, Pasquale spent alone with Father Capua, Father Capua's unrestricted access to Pasquale, and Father Capua's propensity to molest Pasquale. *Id.* at ¶ 46.

7. Father Capua continued to sexually abuse Pasquale on a weekly basis for six years. Basic math informs this equates to 312 opportunities Defendants' agents, employees, and leaders failed to act and prevent Pasquale, a foreseeable victim from continuing to be sexually abused by Father Capua.  *Id.* at ¶¶ 5, 45.

8. Father Capua also requested an immediate transfer away from St. Bernadette, which was granted by the Bishop of Brooklyn, and Father Capua was assigned to St. Thomas Aquinas, another parish in Brooklyn thereafter. *Id* at ¶ 39; Exhibit 2 to SAC.

9. In 2007, Father Capua was placed on leave without privileges after the Diocese of Brooklyn deemed allegations that he had abused several minors. *Id.* at ¶¶ 14

10. Thereafter, Father Capua was removed from ministry and is listed on the Diocese of Brooklyn's 2019 "List of Diocesan Clergy for Whom the Diocese Received Allegations of Sexual Misconduct With a Minor" – specifically as one of the "Clergy Members of the Diocese of Brooklyn with Credible Allegations." *Id.* at ¶ 15.

Plaintiff has affirmatively stated the above before the parties have even exchanged discovery. Not only do Defendants, therefore, wrongly argue Plaintiff has failed to state a "non-conclusory" or "non-speculative" factual basis to allege notice of Father Capua's propensity for and acts of child sexual abuse, but such an argument is premature and should be raised in a summary judgment motion, after the completion of discovery.

Taking the above into consideration, Plaintiff disagrees with Defendants' contention the SAC includes no facts to cause a reasonably prudent person to deem Father Capua's behavior "suspicious," triggering a duty to investigate. Defendants submit a 7-year-old boy being routinely pulled out of class and off the playground to an open vestibule area of St. Bernadette with an outward facing window by an adult man known to be a "bad priest" is "innocent" behavior. Though they take this position, a factfinder could plausibly infer the priests, nuns, and Defendants' other agents, employees, and leaders knew or should have known an adult man known to be a "bad priest" spending time alone with an elementary-aged boy raises red flags. If Father Capua's proclivities and acts with Pasquale were not nefarious, why were they not done with other adults and/or students present?

Reverend Monsignor Francis P. Barilla, Sister Immaculate, and other priests and nuns under the control, supervision, and employ of the Diocese and St. Bernadette had an opportunity to observe the warning signs and risks to Pasquale raised by Father Capua's history and behavior one to two times a week for 7 years. Defendants' agents, employees, and leaders—including the

Bishop—should have been especially suspicious of Father Capua's bizarre conduct and time spent alone with Pasquale given the warnings they received from parishioners Father Capua was a "bad priest" that requested an immediate transfer both to and from St. Bernadette.

A factfinder can also plausibly conclude Father Capua was only able to continue sexually abusing Pasquale for six years because Defendants' leader, the Bishop of Brooklyn, and many other agents and employees, including Reverend Monsignor Francis P. Barilla, and Sister Immaculate, and other priests and nuns under the control, supervision, and employ of the Diocese and St. Bernadette, deliberately turned a blind eye, covered up, and/or condoned the incidents of abuse. This "smack[s] of intentional wrongdoing" and "evince[s] a reckless disregard to the rights of others" by the Diocese of Brooklyn and St. Bernadette's—constituting gross negligence. *C.Q. v. Estate of Rockefeller*, No. 20-CV-2205, 2021 WL 4942802, at *8 (quoting *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996)). Accordingly, Pasquale's negligence and gross negligence claims prevail.

**B.   Plaintiff States a Claim for Negligent Training/Retention/Supervision.**

Under New York law, plaintiffs can sue an employer for negligent retention or supervision if the employer "'knew or should have known' of [the employee's] 'propensity for the conduct which caused [their] injury.'" *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) (quoting *Bumpus v. New York City Transit Auth.*, 851 N.Y.S.2d 591, 591–92 (2d Dep't 2008)). "[I]n addition to the standard elements of negligence," a plaintiff alleging negligent hiring, retention, supervision, and direction must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's

chattels." *Poly Prep*, 2021 WL 4310891, at *11 (citations omitted); *see also Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791 (2d Dept 1997)).

In addition to the standard negligent elements, discussed *supra*, Pasquale has alleged (1) Father Capua was supervised, controlled, and employed by the Diocese and St. Bernadette, *see, e.g.,* SAC at ¶¶ 4, 26-28, 56, 77; (2) at a minimum, Defendants' priests, nuns, employees, and agents were on notice of Father Capua's sexual propensities and/or acts of child sexual abuse, listed *supra*, and (3) the incidents of abuse occurred in a parish owned and operated by Defendants, *see, e.g., id.* at ¶¶ 21, 107.

Contrary to Defendants' assertions, there is no statutory requirement that causes of action sounding in negligent hiring, negligent retention, or negligent supervision be pleaded with heightened specificity. *Kenneth R.,* 654 N.Y.S.2d 791, 793 (1997). "[I]n instances where an employer cannot be held vicariously liable for its employee's torts, the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision. *Id.*

Here, the well-pleaded facts allow the Court to infer more than the mere possibility of misconduct—Pasquale was a foreseeable and preventable victim. The fact Defendants were on notice that Father Capua was a "bad priest" and in charge of "youngsters" at the parish but did not investigate the allegations or take action to prevent Father Capua from accessing vulnerable minors speaks to Defendants' concerted effort to coverup acts of child sexual abuse and to protect diocesan priests. *See* SAC at ¶¶ 30-34; Exhibit 1 to SAC. As this Court has noted, "affirmative misrepresentations or deceitful conduct designed to keep a potential plaintiff from gaining knowledge of an essential element of a viable cause of action for a claim of negligent retention or supervision by an employer of a sexual-predator employee [is] a game-changer." *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 339 (E.D.N.Y. 2012).

The Diocese cites *France v. Touro College* for the proposition Pasquale has not established an employer-employee relationship between the Diocese and Father Capua—despite conceding Father Capua was a priest under the Diocese of Brooklyn assigned to St. Bernadette, which is within the Diocese. There, this Court recommended a security guard plaintiff be given leave to amend after her complaint did not establish the university her employer assigned her to patrol was a "joint employer" for purposes of Title VII. No. 14-CV-4613, 2016 WL 1105400, at *8 (E.D.N.Y. Feb. 16, 2016). The Court reasoned:

> Plaintiff's failure to allege any facts relating to the terms and conditions under which she worked, such as who set her hours and directed her assignments, or even the nature and extent to which Linnen [Touro College's "Maintenance Manager"] supervised her day-to-day work — all facts at least partially within plaintiff's knowledge without the need for further discovery — is fatal to her claim of joint employer status.

*Id.* Important to the court's analysis, "few, if any, factual allegations [supported] her claim that the university controlled the terms and conditions of her employment" and therefore was a joint employer with the security guard team the plaintiff was hired by and reported to. *Id.*

Pursuant to the joint employer doctrine, "an employee may be 'formally employed by one entity,' but 'assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity.'" *Id.* (citing *Arculeo v. On–Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2d Cir.2005). "'A joint employer relationship may be found to exist where there is sufficient evidence that the [defendant] had immediate control over the other company's employees.'" *Id.* (citing *N.L.R.B. v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir.1994)). "Relevant factors include commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Id.* But "'[t]he extent of the employer's right to control the means and manner of the worker's performance is the most important factor[,]'" and other factors "are then of marginal importance." *Id.* (internal quotations omitted).

Plaintiff's SAC establishes both the Diocese and St. Bernadette exercised joint control over Father Capua's "performance," therefore, the Diocese's reliance on *France v. Touro College* is misguided for this reason—among at least two others. Plaintiff clearly states, "Father Capua was employed as a priest at St. Bernadette during the 1960's when the abuse detailed herein occurred." SAC at ¶ 4.[3] Plaintiff submits the failure of St. Bernadette's and the Diocese "to exercise reasonable care to control Father Capua" is what led to his "sexual abuse of [Pasquale] while on Defendants' premises." *Id*. at ¶¶ 64;70. Further, Father Capua, a Diocese of Brooklyn priest, was working and, upon information and belief, living in St. Bernadette's rectory—clearly, both Defendants controlled his performance and whereabouts. *Id*.

Also, unlike in *France v. Touro College*, Pasquale does not have knowledge without the need for further discovery of facts relating to the terms and conditions of Father Capua's employment for the obvious reason Pasquale was a child when the abuse occurred. To penalize Pasquale because she does not know how Father Capua was paid, who determined his schedule and assignments—among other facts within Defendants' sole possession—would be a grave miscarriage of justice.

Finally, it stands to reason Touro College would remain in business if it did not have third party security guards to patrol its premises. The same cannot be said here—St. Bernadette would cease to exist as a Roman Catholic parish and school without Roman Catholic priests to educate its students and minor parishioners and operate its premises generally. Defendants do not dispute St. Bernadette is a religious entity within the Diocese of Brooklyn, which operates both a parish

---

[3] Plaintiff also alleges: "Father Capua was employed by Defendants and under Defendants' direct supervision, employ, and control when he committed the wrongful acts alleged herein. Father Capua engaged in the wrongful conduct while acting in the course and scope of his employment with St. Bernadette and/or accomplished the sexual abuse by virtue of his job-created authority." SAC at ¶ 77; *see also id.* at ¶¶ 15-17.

and a school, and Father Capua was a Roman Catholic priest at St. Bernadette. *See* Defendant St. Bernadette's Motion to Dismiss at p. 2.

In *Caroleo v. Roman Catholic Diocese of Brooklyn*, Judge Silver held the Diocese of Brooklyn and the Franciscan Brothers—two separate legal entities—owed the plaintiff a duty of care as an invitee at St. Francis Preparatory School as it was "property that defendants owned and/or operated." 2021 NY Slip Op 31445(U) (App. Div. 2nd. 2021). *In DiGiorgio v. Roman Catholic Diocese of Brooklyn*, Judge Silver reached the same conclusion: the Diocese of Brooklyn and St. Rose of Lima Church—two separate legal entities—owed the plaintiff a duty of care as an invitee at St. Rose of Lima Church, where the incidents of abuse occurred, because it was "property that defendants owned and/or operated." 2021 N.Y. Slip Op. 31378 (N.Y. Sup. Ct. 2021).

Here, Pasquale is alleging the same: the Diocese and St. Bernadette together owned and/or operated the premises of St. Bernadette and jointly employed diocesan priests, including Father Capua, to instruct St. Bernadette's students and minor parishioners. As stated, this is a widely accepted conclusion. If the Diocese could point to a case that stands for the proposition a diocese does not employ its priests, it would. That case does not exist—and the Diocese's argument it did not exercise joint control, supervision, and employ of Father Capua defies logic.

Defendants argue any negligence claims they are vicariously liable under *respondeat superior* for Father Capua's conduct fail because sexual assault falls out of the scope of an employee's employment. But "[c]ontrary to defendants' suggestions, plaintiff is not alleging that the Diocese and [St. Bernadette] are vicariously liable under *respondeat superior* for [Father Capua's] actions. Rather, the gravamen of [P]laintiff's negligence claim is that the Diocese and [St. Bernadette] owed a duty of care to [P]laintiff" because he was a student and "an invitee on property that defendants owned and/or operated." *Caroleo*, 2021 NY Slip Op 31445(U).

In several recent C.V.A. cases, Judge Silver has explained even if, *arguendo,* the defendants cannot be held vicariously liable for intentional torts, "they can be held vicariously liable for negligence committed in allowing such abuse to take place when a duty of reasonable care existed to safely manage the subject educational facilities." *Id.; DiGiorgio*, 2021 N.Y. Slip Op. 31378 (negligence claims allowed to proceed against the Diocese of Brooklyn and St. Rose of Lima Church); *Ark 51 v. Archdiocese of New York*, No. 950047/2019, 2021 WL 2719319, at *3 (N.Y. Sup. Ct. July 01, 2021) (negligence claims allowed to proceed against the Salesians).

The Diocese points to three cases—with very different facts—where the plaintiff's negligent training/retention/supervision claim failed because the fit between the injurious conduct and scope of employment was off.

First, the Diocese cites *Doe v. Abdulaziz Bin Fahd Alsaud*, where a victim of a sexual assault—though not a C.V.A. case—sued the employer of her rapist, who was a member of a Saudi prince's entourage. 12 F. Supp. 3d 674 (S.D.N.Y. 2014). She alleged the employee's duties involved luring women to the prince. *Id.* at 677-9. But the *Alsaud* court held the plaintiff did not establish a sufficient nexus between those duties (luring women for the prince) and the employee's own sexual misconduct (raping the plaintiff), to state a claim for negligent hiring/supervision/retention. *Id.* at 677-9.

Second, in *Ortiz v. Parkchester North Condominiums*, the court held even if the plaintiff, who was injured by patrolmen during an arrest, had alleged the security guards had violent or dishonest propensities, "the FAC would still be insufficient [to state a negligent training/retention/supervision claim] because it contains no allegations that [d]efendant[] [patrolmen] acted outside the scope of their employment." No. 16-CV-9646, 2018 WL 2976011,

at *10 (S.D.N.Y. June 13, 2018). "To the contrary, the FAC specifically alleges that the acts of [d]efendants [] occurred while they were 'acting within the scope of their employment.'" *Id.*

In contrast, here, Plaintiff alleges Father Capua was able to gain unfettered access to meet, groom, and molest Pasquale ***because*** of his job-created authority. Thus, Father Capua was acting within the scope of his employment when the incidents of abuse occurred at St. Bernadette, and the incidents would not have occurred but-for the fact Father Capua gained the trust of Pasquale and his parents because Father Capua was a priest, and they expected him—along with the other priests, nuns, employees, and agents of the Diocese of Brooklyn and St. Bernadette—to embody ideals shared by Defendants/the Roman Catholic Church. SAC at ¶¶ 56, 62, 77.

Third, and the most recent case with facts, arguably, similar to those presented by Pasquale cited by Defendants is *Doe v. Poly Prep Country Day Sch*. There, the plaintiff was subjected to several incidents of unwelcomed contact and groping in his high school teacher's classroom after class, beginning when the plaintiff was approximately 15 years old. No. 20CV04718DGPK, 2022 WL 4586237, at *3 (E.D.N.Y. Sept. 29, 2022). When the plaintiff was 17 years old, another incident occurred off school premises at the teacher's apartment. *Id.* Though the plaintiff claimed the teacher's classroom was visible to a large study hall, the plaintiff did not state any administrators, educators, or students witnessed the unwelcomed contact and groping. *Id.* at *5-10. The Court resultantly held the defendant school did not have notice or knowledge. *Id.*

Here, Pasquale was only 7 years old when Father Capua began sexually abusing him. SAC at ¶¶ 3-4;19-21. Unlike John Doe, Pasquale affirmatively stated Pasquale's teachers/nuns, and other priests under the Diocese—who also resided at St. Bernadette and taught minor students and parishioners alongside Father Capua—observed Pasquale being pulled out of class and off the playground by Father Capua on a weekly basis. A factfinder could plausibly infer the nuns, priests,

and Defendants' other agents and employees knew or should have known a "bad Priest" spending hours alone with an elementary-aged boy in the vestibule of a parish raises red flags.

"Where an employer cannot be held vicariously liable for its employee's torts [because they occur outside the scope of his employment], the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision." *Bouchard v. New York Archdiocese*, 719 F. Supp. 2d 255, 260–61 (S.D.N.Y. 2010) (citing *Kenneth R.*, 654 N.Y.S.2d 791 (2d Dep't 1997)). "A claim for negligent supervision or retention arises when an employer places an employee in a position to cause foreseeable harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee." *Vione v. Tewell*, 820 N.Y.S.2d 682, 687 (N.Y.Sup.Ct.2006). A negligent retention theory is, therefore, "viable where the school had notice of proper allegations of a teacher's inappropriate contact with a student, and failed to investigate the allegations." *Jones ex rel. Jones v. Roman Cath. Archdiocese of New York*, 918 N.Y.S.2d 398 (Sup. Ct. 2010).

In sum, Pasquale was not introduced to Father Campbell at a summer camp in Maryland and then sexually abused two years later under auspicious premises. Nor was Pasquale groped 15-20 times in a high school classroom and private apartment thereafter. Pasquale was sexually abused approximately once to twice a week for six years beginning when Pasquale was 7 years old at St. Bernadette—in Brooklyn, New York—by a priest under the Diocese of Brooklyn. Basic math informs Pasquale was sexually abused at least 312 times—which equates to 312 opportunities Defendants' agents, employees, and leaders failed to act and prevent further incidents of child sex abuse after witnessing Father Capua—a known "bad priest" which a perchance for adolescent boys—call an elementary aged boy out of class and bring him to the vestibule of the parish, instead of allowing him to play ball and attend class with his schoolmates.

## C. <u>Plaintiff States a Claim for Premises Liability</u>.

"[U]nder a theory of premises liability, it is the duty of a property owner to protect plaintiff from foreseeable harm caused by third persons." *Reno v. Churchville-Chili Cent. Sch. Dist.*, 148 N.Y.S.3d 683 (N.Y. Sup. Ct. 2021) (citations omitted); *see also Nallan v. Helmsley-Spear, Inc.*, 407 N.E.2d 451 (N.Y. 1980). The duty has been applied "not only in cases where the assailant was a stranger to the defendant, but also, as in the case here, where the underlying act was committed by an employee of the establishment." *JG v. Goldfinger*, 79 N.Y.S.3d 1 (App. Div. 2018).

In addition to their duty to protect Pasquale as a student, as discussed above, Defendants had a duty to protect Pasquale as property owners. This duty was breached by allowing Father Capua to work at St. Bernadette's where he had unfettered access to meet, groom, and molest Pasquale in a vestibule area of St. Bernadette. SAC at ¶¶ 41-47; 106-111. Thus, the SAC explains how Father Capua presented a foreseeable risk to Pasquale, and, unlike the victim in *Maheshwari v. City of New York*, Pasquale was not subjected to "a random act of violence." 2 N.Y.3d 288, 294 (N.Y. 2004). Though Defendants argue they cannot be held vicariously liable for the intentional torts committed by Father Capua, they can be held vicariously liable for negligence committed in allowing such abuse to take place when a duty of reasonable care existed to safely manage the subject educational facilities. *See Caroleo*, 2021 NY Slip Op 31445(U).

Moreover, Defendants contend they had no notice of Father Capua's propensities and/or actions, but they have not conclusively established their lack of knowledge as a matter of law; Pasquale has plausibly alleged Defendants ***were*** on notice of Father Capua's propensities and actions. For example, as discussed *supra*, in 1959, a longtime parishioner from St, Alphonsus sent the Bishop of Brooklyn a letter stating, "[o]ne of the statements that I hear repeatedly is that Father Capua is a bad priest." *See* Exhibit 1 to SAC. The parishioner went on to express that she had seen

a rise in the number of teenagers attending the church and how Father Capua was in charge of the "youngsters" *Id.* Despite actual notice and knowledge Father Capua was a "bad priest." Defendants did not further investigate these allegations, did not discipline Father Capua, nor did they take action in preventing Father Capua from accessing minors. They failed to protect Pasquale and other minors/foreseeable victims from harm. *Id.* And, as Judge Silver ordered in *Caroleo v. Diocese of Brooklyn*, Plaintiff seeks additional discovery, which remains in Defendants' sole possession, to further reconcile the issue of notice raised by Defendants. *Id.*

### D. <u>Plaintiff States a Claim for Breach of Fiduciary Duty.</u>

Courts have articulated a fiduciary duty exists when a plaintiff's relationship with a church extends beyond that of an ordinary parishioner. *See Doe v. Holy See (State of Vatican City)*, 17 A.D. 3d 793, 796 (N.Y. App. Div. 3d Dep't 2005). A fiduciary relationship can be established upon a showing that a congregant's relationship with a church entity resulted in "de facto control and dominance" when the congregant was "vulnerable and incapable of self-protection regarding the matter at issue." *Marmelstein v. Kehillat New Hempstead*, 892 N.E.2d 375, 379 (N.Y. 2008).

Here, Defendants exercised additional *de facto* control and dominance over Pasquale in his capacity as a minor parishioner, which created a fiduciary relationship beyond Defendants' established duties to Pasquale as a student and invitee at St. Bernadette. The SAC alleges that there existed a deep fiduciary relationship of trust, confidence and reliance between Plaintiff and Father Capua. This relationship arose when Father Capua held himself out as able to provide a safe and secure environment for Plaintiff; Plaintiff's parents entrusted Plaintiff to Defendants' care and expected that Plaintiff would be safe and properly supervised in an environment free from harm and abuse; Plaintiff was a vulnerable minor, and unable to protect himself; and Defendants affirmatively assumed a position of empowerment over Plaintiff. *Id* at ¶ 52-55, 65-69.

This claim is not duplicative, and the existence of a fiduciary duty is a fact specific question to be determined by the factfinder, such that breach of fiduciary duty claims should not be dismissed before the parties have the opportunity to conduct discovery. *See Doe v. Holy See*, 17 AD3d at 793.

## CONCLUSION

Pursuant to the C.V.A., hundreds of cases were filed against New York-based dioceses and schools and parishes under their direction, control, employ, and supervision. Many of these cases have been consolidated under Hon. George J. Silver—who routinely denies defendants' motions to dismiss and instructs the parties to proceed with discovery. *See, e.g., Peter DiGiorgio v. Roman Cath. Diocese of Brooklyn, St. Rose of Lima Church*, No. 520009/2019 (N.Y. Sup. Ct. 2021).

Further, as two recent C.V.A. orders illustrate, "when deciding a motion to dismiss, the Court is to liberally construe the factual allegations in the complaint and deem them to be true, while giving the nonmoving party the benefit of all favorable inferences (*see Magee-Boyle v Reliastar Life Ins. Co. of New York*, 173 AD3d 1157, 1158-59 [2d Dept 2019])." *Fortuso v. Archdiocese of New York*, No. 950627/2021, 2022 WL 2916786, at *2 (N.Y. Sup. Ct. July 22, 2022).

"Plaintiff is not required to provide extensively detailed allegations at this juncture in the litigation. Liability for negligent hiring is based not on the tortious conduct of the employee but on the negligence of the defendant-employer for failures involving the risk of harm by the employee to others (*see, e.g. Ford v Gildin*, 200 AD2d 224 [1st Dept 1994])." *Id*. And "[d]iscovery from defendant is likely to shed light on that issue, and others." *Id. See also Pulizzi v. The Rockefeller University Hosp.*, No. 950464/2020, 2022 WL 4357101, at *2 (N.Y. Sup. Ct. Sep. 20, 2022) ("At this juncture, the Court finds that plaintiff's complaint sufficiently states each of the

elements for negligent hiring. Specifically, plaintiff pleaded facts inferring that the employer knew or should have known of [the doctor's] propensity [to sexually abuse children]. Whether there were any earlier indications relative to the hiring of [the doctor] is within defendants' knowledge and discovery from defendants is likely to shed light on this issue and others").

Accordingly, Pasquale respectfully requests the Court deny Defendants' motions to dismiss in their entirety and allow the parties to proceed with discovery—which largely remains in Defendants' sole possession, knowledge, and control. In the alternative, Pasquale requests the opportunity to amend his pleadings, should they be found in any way deficient by the Court.

Dated: December 20, 2022.

Respectfully Submitted,

Ashley M. Pileika
New York Bar No. 974605
ashley@darrenwolf.com
Darren Wolf*
Texas State Bar No. 24072430
darren@darrenwolf.com
**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
P:  214-346-5355
F:  214-346-5909
*Admitted pro hac vice*

*Attorneys for Plaintiff*