UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

PASQUALE J. GUERRIERO,

                    Plaintiff,

       v.

DIOCESE OF BROOKLYN and SHRINE
CHURCH OF ST. BERNADETTE,

                 Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
21-CV-4923 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Pasquale J. Guerriero commenced the above-captioned action on August 13,

2021, and filed a Second Amended Complaint ("SAC") on August 24, 2022, against Defendants

Diocese of Brooklyn (the "Diocese") and the Shrine Church of St. Bernadette ("St. Bernadette"),

alleging state law claims of negligence; negligent training, supervision, and retention; gross

negligence; premises liability; and breach of fiduciary duty pursuant to the New York Child

Victim Act ("CVA").[1]  (Compl., Docket Entry No. 1; SAC, Docket Entry No. 52).  Plaintiff

alleges that while he was a minor student at St. Bernadette during the 1960s, he was regularly

sexually assaulted by Father Nicholas Capua, a priest employed by St. Bernadette.  (*See* SAC.)

      Defendants move separately to dismiss the SAC pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure, and Plaintiff opposes the motions.[2]  For the reasons set forth below,

the Court grants in part and denies in part Defendants' motions.

---

    [1]  The CVA created a two-year revival window for previously time-barred childhood
sexual abuse claims.  *See* N.Y. C.P.L.R. § 214-g.

    [2]  (Def. St. Bernadette's Mot. to Dismiss ("St. Bernadette's Mot."), Docket Entry No. 63;
Def. St. Bernadette's Mem. in Supp. of St. Bernadette's Mot. ("St. Bernadette's Mem."), Docket

I. **Background**

The Court assumes the truth of the factual allegations in the SAC for the purpose of deciding Defendants' motions.

   a.   **Father Capua's employment history**

The Diocese is a religious organization and non-profit religious corporation located in Brooklyn, New York.  (SAC ¶ 20.)  St. Bernadette is a religious entity within the Diocese that operates a parish and a school in Brooklyn, New York.  (*Id.* ¶ 21.)  During all relevant times, Plaintiff was seven to fourteen years old.  (*See id*. ¶¶ 5, 19, 41.)

Father Capua was a priest ordained by the Diocese and assigned to St. Alphonsus Church in 1956.  (*Id.* ¶ 29.)  In 1959, a parishioner of St. Alphonsus sent a letter to the Bishop of Brooklyn regarding Father Capua.[3]  The parishioner stated that she wrote the letter to respond to "nasty" statements she had been hearing regarding Father Capua being a "bad priest."  (May 1959 Letter 1–2.)  The parishioner then praised Father Capua for various actions he had taken, including being "the first to the side of 13–16 year old boys who were involved in a case — very immoral," and stated that she had never "seen so many teen-ager[s] at the Communion rail there, since Father Capua took over the youngsters."  (*Id.* at 2–3.)  She concluded that she believed Father Capua "could stand a word of encouragement from you, your Eminence, since I am sure he must hear this nonsense too [and] it must be disheartening for him."  (*Id.* at 4.)

_____

Entry No. 64; Def. Diocese's Mot. to Dismiss ("Diocese's Mot."), Docket Entry No. 67; Def. Diocese's Mem. in Supp. of Diocese's Mot. ("Diocese's Mem."), Docket Entry No. 67-1; Pl.'s Mem. in Opp'n to Defs.' Mots. ("Pl.'s Opp'n"), Docket Entry No. 65; Def. St. Bernadette's Reply Mem. in Supp. of St. Bernadette's Mot. ("St. Bernadette's Reply"), Docket Entry No. 66; Def. Diocese's Reply Mem. in Supp. of Diocese's Mot. ("Diocese's Reply"), Docket Entry No. 68.)

   [3]  (May 20, 1959 Letter ("May 1959 Letter"), annexed to SAC as Ex. 1, Docket Entry No. 52-1.)

2

In 1961, two years after the letter, Father Capua requested a transfer from St. Alphonsus, and the Bishop granted the request.  (SAC ¶ 10.)  The Diocese transferred Father Capua to St. Bernadette in June of 1961, where he remained until he was transferred to the parish of St. Thomas Aquinas in February of 1967.  (*See* St. Bernadette's Emp. File, annexed to SAC as Ex. 2, Docket Entry No. 52-2.)  The Diocese then transferred Father Capua to two additional Brooklyn parishes before it permanently removed him from the ministry in 2007.  (SAC ¶¶ 38–40.)  The Diocese thereafter placed Father Capua on leave without privileges.  (*Id.* ¶ 14.)  In 2019, the Diocese added Father Capua to its list of "Clergy Members of the Diocese of Brooklyn with Credible Allegations" of sexual misconduct with a minor.  (*Id.* ¶ 15.)

   **b.   The alleged abuse of Plaintiff**

Plaintiff alleges, on information and belief, that Father Capua requested the transfer from St. Alphonsus in 1961 because of abuse allegations against him.  (*Id.* ¶ 38.)  Father Capua was employed by St. Bernadette as an educator and spiritual guide beginning in 1961.  (*Id.* ¶¶ 28, 34.)  When the students were playing ball in the yard of St. Bernadette, Father Capua would often tell them he needed an altar boy to assist him, and he would frequently select Plaintiff.  (*Id.* ¶¶ 42–43.)  Father Capua and Plaintiff would enter a vestibule that had a window overlooking the yard, and Father Capua would direct Plaintiff to watch through the window while the other boys played.  (*Id.* ¶¶ 42, 44.)  While Plaintiff observed the other students playing in the yard, Father Capua would come up behind Plaintiff and rub against him.  (*Id.* ¶ 44.)  Father Capua also sexually abused Plaintiff once to twice per week in the basement of St. Bernadette for a period of seven years.  (*Id.* ¶¶ 5, 45.)  He began to abuse Plaintiff when Plaintiff was seven years old and continued to abuse him throughout the 1960s.  (*Id.* ¶¶ 41, 45.)  Father Capua "regularly called [Plaintiff] out of class, fed him wine, and forced him to undress."  (*Id.* ¶ 6.)  The sexual abuse included touching, kissing, groping, squeezing, and penetration.  (*Id.* ¶ 3.)

3

Plaintiff alleges that Defendants knew about the amount of time Father Capua spent alone with him, Father Capua's unrestricted access to him, and Father Capua's ability to molest him. (*Id.* ¶ 46.)  In addition, he contends that throughout the period that Father Capua abused him, St. Bernadette employees, such as Reverend Monsignor and Sister Immaculate, suspected that abuse was occurring because Plaintiff would be pulled from class and taken to Father Capua, but they took no action with respect to their suspicions.  (*Id.* ¶ 47.)

## II.  Discussion

### a.  Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the Complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (quoting *Iqbal*, 556 U.S. at 678).

### b.   Plaintiff satisfies Rule 8 of the Federal Rules of Civil Procedure

The Diocese argues that Plaintiff fails to comply with Rule 8 of the Federal Rules of Civil Procedure because the Diocese and St. Bernadette "are separate legal entities" and the SAC "does not distinguish the acts of each [D]efendant." (Diocese's Mem. 7.)  In support, the Diocese argues that "[t]he fact that St. Bernadette is a separate religious corporation within the geographical and ecclesiastical territory of the Brooklyn Diocese does not change the fact that the two must be distinguished in a complaint," (*id.*), and attaches a certificate of incorporation of St. Bernadette, (*id.* at 7 n.1; *see also* Certificate of Incorp., annexed to Decl. of Randall L. Morrison as Ex. A, Docket Entry No. 67-3).

Plaintiff argues that "the Diocese . . . and St. Bernadette acted in unison and jointly employed and controlled Father Capua and the premises of St. Bernadette and are, therefore, jointly liable." (Pl.'s Opp'n 7 n.1.)  In support, Plaintiff argues that "St. Bernadette is indisputably a religious entity within the Diocese" who may be held jointly liable with the Diocese for the alleged abuse and that "[e]ven if the Diocese of Brooklyn and St. Bernadette are separate entities, this by no means suggests each entity's liability must be kept 'separate.'" (*Id.* at 6.)  Plaintiff contends that the SAC "repeatedly demonstrates Father Capua was under the shared direction, control, employ, and supervision of the Diocese of Brooklyn and St. Bernadette when he sexually abused [Plaintiff]" and that the "educational facilities and premises of St. Bernadette" were under both entities' "shared direction, control, and supervision." (*Id.* at 8–9.)

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, a complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Clark v. Hanley*, 89 F.4th 78, 94 (2d Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). "To satisfy this standard, the complaint must at a minimum 'disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and

to know whether there is a legal basis for recovery.'" *Harnage v. Lightner*, 916 F.3d 138, 141 (2d Cir. 2019) (quoting *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000)); *see also Blakely v. Wells*, 209 F. App'x 18, 20 (2d Cir. 2006) ("The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." (first quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); and then citing *Kittay*, 230 F.3d at 541)).  "Rule 8 . . . 'demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678); *see also City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396 (2d Cir. 2024) (quoting same).

The allegations contained in the SAC are sufficient to put the Diocese on "notice of the claim[s] asserted." *Blakely*, 209 F. App'x at 20 (citations omitted).  Although Plaintiff asserts each of his five claims against "[a]ll Defendants" and refers to "Defendants" jointly throughout the SAC without distinguishing between the Diocese and St. Bernadette, (*see* SAC ¶¶ 41–127), the SAC provides sufficiently specific factual allegations to give the Diocese "a fair understanding of what [Plaintiff] is complaining about," *Harnage*, 916 F.3d at 141 (citation omitted) — namely, sexual abuse allegedly perpetrated by a priest employed by a parish within the Diocese.  Accordingly, Plaintiff satisfies Rule 8's requirements and has provided sufficient detail to give the requisite notice to the Diocese.[4]  *See LaFrantz v. St. Mary's Roman Cath. Church*, No. 21-CV-4920, 2024 WL 216718, at *3 (E.D.N.Y. Jan. 19, 2024) (noting that, while

---

[4]  The Court declines to dismiss the SAC on group pleading grounds and considers St. Bernadette and the Diocese as joint employers for purposes of this motion.  *See LaFrantz v. St. Mary's Roman Cath. Church*, No. 21-CV-4920, 2024 WL 216718, at *3 (E.D.N.Y. Jan. 19, 2024) ("Drawing all reasonable inferences in [the p]laintiff's favor, the court declines to dismiss the [amended complaint] on group pleading grounds and considers the Brooklyn Diocese and St. Mary's as joint employers for purposes of this motion.").

the plaintiff "could have alleged in greater detail conduct specific to each [d]efendant," her

complaint did not fail to give any notice to the defendants pursuant to Rule 8 because she alleged

that the "diocesan priest [was] employed by St. Mary's and 'under [d]efendants' direct

supervision, employ, and control when he committed the wrongful acts'" (citation omitted));

*Kashef v. BNP Paribas SA*, No. 16-CV-3228, 2021 WL 1614406, at \*2–3 (S.D.N.Y. Apr. 26,

2021) (noting that, although the plaintiffs referred to "defendants" throughout the complaint and

asserted claims against "all defendants," they "sufficiently put all defendants on notice of the

nature of the claims against them," satisfying the requirements of Rule 8); *Ausco Prods. v. Axle,

Inc.*, No. 19-CV-6798, 2020 WL 7028521, at \*2 (W.D.N.Y. Nov. 30, 2020) (finding

unpersuasive the defendants' argument that the plaintiff engaged in impermissible group

pleading when, although the plaintiff referred collectively to "defendants" in describing the

challenged conduct, the allegations provided "notice of the substance of the claims").

### c.   Negligence claim

St. Bernadette argues that Plaintiff may not pursue his negligence claim under the theory

of respondeat superior since "a sexual assault perpetrated by an employee is never in furtherance

of an employer's business and is always a clear departure from the scope of employment."[5]  (St.

Bernadette's Mem. 8.)  In addition, St. Bernadette argues that Plaintiff "fails to plausibly allege

how the Parish knew or should have known of [Father] Capua's propensity for the conduct that

caused the injury, prior to the injury's occurrence" and therefore fails to plead an essential

element of his claims.  (*Id.* at 10.)  In support, St. Bernadette argues that the May 1959 Letter

---

[5]  Plaintiff concedes that Defendants cannot be held liable under a theory of respondeat superior.  (*See* Pl.'s Opp'n 19 ("[C]ontrary to [D]efendants' suggestions, [P]laintiff is not alleging that the Diocese and [St. Bernadette] are vicariously liable under *respondeat superior* for [Father Capua's] actions." (second alteration added)).)  Accordingly, the Court does not address this argument.

"does not identify or specify any misconduct," and that Plaintiff "does not allege whether or how the Parish would have even learned of private correspondence with the bishop" or that Plaintiff "ever reported, or even discussed the alleged abuse with anyone." (*Id.*) Further, St. Bernadette argues that Plaintiff improperly attempts to imply that "notice of sexual assault should be presumed as to all Catholic organizations" and that this assertion of "notice based on alleged generalized conduct" should be rejected. (*Id.* at 11.) Finally, St. Bernadette argues that Plaintiff "fails to explain how many transfers would be acceptable or unusual" and misstates the timing of Father Capua's transfer by two years. (*Id.* at 12.)

The Diocese argues that it is a legally distinct entity from St. Bernadette and owes no standalone duty to Plaintiff. (Diocese's Mem. 9–13.) It also argues that Plaintiff fails to allege that the Diocese knew or should have known of any danger to Plaintiff and that Plaintiff "relies entirely on speculation" to support his argument that the Diocese knew or should have known of Father Capua's propensity for sexual misconduct. (*Id.* at 14–19.) It argues that Plaintiff "misconstrues," "misquot[es]," and "distorts the meaning" of the May 1959 Letter to "suggest that [it] had notice and knowledge" of Father Capua's prior misconduct. (*Id.* at 15.) The Diocese contends that the May 1959 Letter "praise[s] [Father] Capua by listing his good deeds and work on behalf of the parish" and "does not provide an allegation of sexual abuse against Capua," since the "accusation that Capua was a 'bad priest' indicates nothing about a propensity to commit sexual abuse" and "it is implausible that a parishioner would write a letter praising Capua if the accusations of him being a 'bad priest' had to do with sexual misconduct." (*Id.* at 15–16.) The Diocese further argues that Plaintiff's other allegations are conclusory or rely on "generalizations about the Catholic Church writ large [that] are not specific to the Brooklyn Diocese" or Father Capua and that Plaintiff "does not allege that the Brooklyn Diocese became aware of [Father] Capua's propensity to commit sexual assault during Plaintiff's time as a student at St. Bernadette." (*Id.* at 18.)

8

Plaintiff argues that Defendants "owed a duty of care to [P]laintiff because he was a student and an invitee on property that [D]efendants owned and/or operated." (Pl.'s Opp'n 19 (citation and internal quotation marks omitted); *id.* at 11.) He further argues that Defendants "breached the duties they owed to [Plaintiff] as a student and invitee by failing to exercise reasonable care to safely manage the priests under their employ, direction, and control tasked with educating St. Bernadette's students and minor parishioners." (*Id.* at 11–12.) In addition, Plaintiff argues that he adequately alleges notice of Father Capua's misconduct based on the May 1959 Letter. (*Id.* at 23–24.) In support, Plaintiff argues that St. Bernadette should have been on notice of Father Capua's propensity for abuse because St. Bernadette employees "observed [Plaintiff] being pulled out of class and off the playground by Father Capua on a weekly basis" and therefore a factfinder could plausibly infer that "a 'bad [p]riest' spending hours alone with an elementary-aged boy in the vestibule of a parish raises red flags." (*Id.* at 21–22.)

To establish a prima facie case of negligence under New York law,[6] "a plaintiff must prove (1) that the defendant owed [him] a duty; (2) that the defendant breached that duty; and (3) that [he] suffered injuries proximately resulting from that breach." *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)); *see also In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014) (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013)). Furthermore, a plaintiff must establish that their injury was foreseeable. *Aegis Ins. Servs. v. 7 World Trade Co.*, 737 F.3d 166, 177 (2d Cir. 2013) ("[A] plaintiff must establish that a

_____

[6] Because this action was removed from New York state court on the basis of diversity of citizenship between the parties, (*see* Civil Cover Sheet, Docket Entry No. 2), Plaintiff's claims are governed by New York substantive law and federal procedural law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Sarkees v. E. I. Dupont De Nemours & Co.*, 15 F.4th 584, 588 (2d Cir. 2021) ("In a diversity of citizenship case, state law . . . applies to substantive issues, and federal law applies to procedural issues.").

harm was within the ambit of reasonably foreseeable risk . . . ."); *Pinero v. Rite Aid of N.Y., Inc.*, 743 N.Y.S.2d 21, 22 (App. Div. 2002) ("To establish a claim in negligence, plaintiff must show that the defendant owed her a duty to protect her from injury; a duty that only arises when the risk of harm is reasonably foreseeable."), *aff'd*, 99 N.Y.2d 895 (2002).

Plaintiff alleges that Defendants owed him a duty of care as a student (*in loco parentis*) and as an invitee on Defendants' property (landowner).  The Court discusses each of these alleged duties in turn below.

### i. *In loco parentis*

### 1. **Duty owed**

"[T]he concept of in loco parentis forms the basis of the duty owed by a school district to students within its charge in the context of a negligent supervision claim."  *Doe v. Hauppauge Union Free Sch. Dist.*, 184 N.Y.S.3d 150, 152 (App. Div. 2023).  "In New York, schools owe a special duty . . . to students, requiring a school to act when a child, while in its charge, is threatened by the negligence of a third party, and it must make reasonable efforts to anticipate such threats and will be held liable for foreseeable injuries proximately related to the absence of adequate supervision."  *LaFrantz*, 2024 WL 216718, at *4 (quoting *Curtis v. Gates Cmty. Chapel of Rochester, Inc.*, No. 20-CV-06208, 2023 WL 1070650, at *2 (W.D.N.Y. Jan. 27, 2023)); *A.J. v. Canastota Cent. Sch. Dist.*, 184 N.Y.S.3d 433, 436–37 (App. Div. 2023) ("[Schools] are under a duty to adequately supervise the students in their charge[,] and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." (second alteration in original) (quoting *Mirand v. City of New York*, 84 N.Y.2d 44, 49 (1994))).  The duty owed "derives from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians."  *LaFrantz*, 2024 WL 216718, at *4 (quoting *Mirand*, 84 N.Y.2d at 49); *see also Doe v. Poly Prep Country Day Sch.*, No. 20-CV-

4718, 2022 WL 4586237, at *10 (E.D.N.Y. Sept. 29, 2022) ("[B]y virtue of "assuming physical

custody and control over [their] students" and "effectively tak[ing] the place of parents and

guardians," schools "must 'adequately supervise the students in their charge and they will be held

liable for foreseeable injuries proximately related to the absence of adequate supervision.'"

(quoting *Hammond v. Lincoln Tech. Inst., Inc.*, No. 10-CV-1933, 2012 WL 273067, at *6

(E.D.N.Y. Jan. 30, 2012))); *In re Roman Cath. Diocese of Rockville Centre*, 651 B.R. 146, 163

(S.D.N.Y. Bankr. 2023) (same) (quoting *Mirand*, 84 N.Y.2d at 49).  "Schools are not insurers of

safety, however, for they cannot reasonably be expected to continuously supervise and control all

movements and activities of students," but must "exercise such care of [students in their charge]

as a parent of ordinary prudence would observe in comparable circumstances."  *Poly Prep*, 2022

WL 4586237, at *10 (quoting *Mirand*, 84 N.Y.2d at 49).

  Plaintiff has plausibly alleged that Defendants had a duty to Plaintiff *in loco parentis*.

Plaintiff alleges that Defendants' duty "arose because of, *inter alia*, a special relationship between

the school and the minor students attending the school," and that Defendants "agreed to educate,

care for, and keep safe the minor students in exchange for tuition, for which Defendants accepted to

fund and promote their school and initiatives."  (SAC ¶¶ 97–98.)  Plaintiff alleges that the resulting

duty was one "to warn o[f] and report to the proper authorities the deviant propensities of Father

Capua, and ultimately to prevent sexual, physical, and mental abuse of all minors within their care,

control, and/or custody."  (*Id.* ¶ 68); *see LaFrantz*, 2024 WL 216718, at *4 (finding that the plaintiff

sufficiently alleged that the defendants had a duty to the plaintiff *in loco parentis* because her

complaint alleged that the defendants' duty arose from a special relationship between the school

and the minor students attending the school and the defendants "agreed to educate, care for, and

keep safe the minor students in exchange for tuition, for which [the d]efendants accepted" (citations

omitted)); *see also Davila v. Orange County*, 187 N.Y.S.3d 261, 263 (App. Div. 2023) (finding that

11

the plaintiff adequately stated a negligence claim against the defendant when "the complaint alleged, inter alia, that the [defendant] 'assumed custody and control over' the plaintiff, acted 'in loco parentis,' and assumed a 'special duty' to the plaintiff due to his 'high degree of vulnerability'").  Accordingly, the Court finds that Plaintiff has plausibly alleged that Defendants owed him a duty *in loco parentis*.

## 2.   Breach of duty

"[T]he standard to determine whether the school has breached its duty [to adequately supervise students] is to compare the school's supervision and protection to that of 'a parent of ordinary prudence placed in the identical situation and armed with the same information.'"  *Poly Prep*, 2022 WL 4586237, at *11 (second alteration in original) (quoting *Dia CC. v. Ithaca City Sch. Dist.*, 758 N.Y.S.2d 197, 200 (App. Div. 2003)); *see also Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012).  "In cases involving harm caused by an individual's intentional acts, although a plaintiff 'generally must demonstrate the school's prior knowledge or notice of the individual's propensity or likelihood to engage in such conduct,' a school may be held liable absent such knowledge or notice when 'the danger and risk of harm could have been reasonably foreseen and prevented by the institution.'"  *Poly Prep*, 2022 WL 4586237, at *11 (first quoting *Dia CC.*, 758 N.Y.S.2d at 200; and then quoting *Diamond Jewels v. Lewis*, No. 15-CV-5760, 2019 WL 5896224, at *23 (E.D.N.Y. Nov. 12, 2019) (collecting cases)).

Drawing all inferences in Plaintiff's favor, Plaintiff has plausibly alleged that Defendants breached their duty to him because they knew or should have known of Father Capua's propensities or should have "reasonably foreseen and prevented" Father Capua's abuse.  *Poly Prep*, 2022 WL 4586237, at *10 (citations omitted).  Plaintiff cites ten factual allegations in his SAC that, when considered together, plausibly allege that Defendants had notice of Father

12

Capua's propensities.  For example, Plaintiff alleges that "Defendants' employees, agents, and leaders . . . knew as early as 1959, parishioners widely regarded Father Capua as a 'bad priest,' yet they failed to investigate these allegations."  (Pl.'s Opp'n 13 (first citing SAC ¶¶ 30–34; and then citing May 1959 Letter); *see also* May 1959 Letter 1–2 (explaining that the author wrote the letter in response to "nasty statements about one of our priests, namely, Father Nicholas Capua" and that other individuals in the congregation believed Father Capua was a "bad priest" and had stated that they planned to "report him to the Bishop").)  He also alleges that the letter references Father Capua's propensity to focus on younger boys at his previous parish, St. Alphonsus.  (Pl.'s Opp'n 13 (noting that "Father Capua 'was the first to the side of 13–16 year[] old boys who were involved in a case — very immoral'" and that there had never been "so many teenagers at the parish, 'since Father Capua took over the youngsters'" (quoting May 1959 Letter)).)  Plaintiff therefore alleges that, "[a]lthough there was suspicion and red flags raised to Defendants' agents, employees, and leaders that Father Capua posed a threat to adolescent boys, Defendants took no action to prevent [Plaintiff] . . . from sexual abuse," allowing Father Capua to pull him out of class or off the playground once or twice a week "in plain view of Defendants' agents, employees, and leaders," feed him wine, force him to undress, and sexually abuse him.  (*Id.*; *see also* SAC ¶¶ 5–6, 41–47.)  In addition, Plaintiff alleges, on information and belief,[7] that "Father Capua

---

[7]  The Second Circuit has explained:

> A plaintiff may satisfy the plausibility standard by pleading facts upon information and belief, but a plaintiff "cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory.  Those magic words will only make otherwise unsupported claims plausible when "the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."

*Evergreen E. Coop. v. Whole Foods Mkt., Inc.*, No. 21-2827, 2023 WL 545075, at *2 (2d Cir. Jan. 27, 2023) (quoting *Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018)); *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (same); *see also Mott v. County of*

requested a transfer from St. Alphonsus in 1961 because abuse allegations against him surfaced," (SAC ¶ 38), and that "[D]efendants transferred Father Capua from parish to parish after allegations of child sex abuse surfaced against him at each," (Pl.'s Opp'n 4).  Taken together, these allegations raise a plausible inference that Defendants "should have made a reasonable effort to anticipate the threat of abuse" by Father Capua.  *LaFrantz*, 2024 WL 216718, at *4.

In comparable circumstances, "a parent of ordinary prudence" who suspected their child was being sexually assaulted would not allow such suspected assault to go uninvestigated.  *See, e.g.*, *id.* at *5 ("Defendants' failure to anticipate [the priest]'s abuse, coupled with their failure to warn parents and report his conduct, their failure to prevent [the priest] from private 'unfettered access' to students like the [p]laintiff, and their failure to create or enforce procedures to prevent sexual abuse of children, plausibly show that the level of supervision and protection provided by [the d]efendants fell below that of an identically situated, ordinarily prudent parent." (citations omitted)); *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 569 (E.D.N.Y. 2021) (finding that the defendant school's failure to "monitor, supervise, or oversee students' interactions with [an alleged abuser]" and failure to "meaningfully investigate or respond to accusations of abuse" fell below "that the level of supervision and protection . . . of an identically situated, ordinarily prudent parent").  Accordingly, the Court finds that Plaintiff has plausibly alleged that Defendants breached their duty owed to Plaintiff *in loco parentis*.

### 3.  Harm arising from breach

"A 'defendant's negligence qualifies as a proximate cause where it is a substantial cause of the events which produced the injury.'"  *Dooley v. United States*, 83 F.4th 156, 162 (2d Cir. 2023)

---

*Monroe*, No. 20-CV-6809, 2021 WL 2042623, at *4 (W.D.N.Y. May 21, 2021) ("When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on secondhand information that [he] believes to be true." (quoting *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 431–32 (S.D.N.Y. 2014))).

(quoting *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016)); *id.* ("To carry the burden of proving a prima facie [negligence] case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury." (alteration in original) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980))).

Plaintiff has plausibly alleged proximate causation.  He alleges that Defendants' breach of their duty resulted in his being molested repeatedly over a period of years, resulting in severe physical and emotional injuries requiring psychiatric and medical treatment.  (*See, e.g.*, SAC ¶¶ 50, 72–73, 103 (listing Plaintiff's injuries, including "physical shock to the nervous system and emotional distress," "severe mental anguish and trauma," "sexual dysfunction," and "past and future medical expenses for psychological treatment, therapy, and counseling," which were "a direct and proximate result of Defendants' acts, omissions, . . . and conduct").)  Accordingly, the Court finds that Plaintiff has plausibly alleged that he "suffered injuries proximately resulting from that breach."  *Coyle*, 954 F.3d at 148; *see also LaFrantz*, 2024 WL 216718, at *4–5; *PC-41 Doe*, 590 F. Supp. 3d at 569 (finding that a plaintiff who alleged that a school failed to "investigate or respond to accusations of abuse" had plausibly alleged that the defendants' failures were the "substantial cause of his injuries" and therefore had adequately pleaded a negligence claim).

### ii.   Landowner

#### 1.   Duty owed

"Under New York law, 'landowners and business proprietors have a duty to maintain their properties in reasonably safe condition,'" which "may extend to controlling the conduct of third persons who frequent or use the property."  *Marasligiller v. City of New York*, 217 F. App'x 55, 57 (2d Cir. 2007) (quoting *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 582–83 (1997)); *see also Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995) ("[A landowner's] duty is a broad one, and it includes the obligation . . . to exercise reasonable care in protecting visitors from the

15

foreseeable, injurious actions of third parties." (citations omitted)).  New York courts have

recognized a landowner's duty to "control the conduct of third persons on their premises when

they have the opportunity to control such persons and are reasonably aware of the need for such

control." *Maysonet v. KFC, Nat'l Mgmt. Co.*, 906 F.2d 929, 931 (2d Cir. 1990) (quoting

*D'Amico v. Christie*, 71 N.Y.2d 76, 85 (1987)); *Maurizi v. Callaghan*, No. 20-CV-922, 2022 WL

1446500, at *14 (W.D.N.Y. Feb. 25, 2022) (quoting same), *report and recommendation adopted

by* 2022 WL 1444182 (W.D.N.Y. May 5, 2022); *see also LaFrantz*, 2024 WL 216718, at *4

("[L]andowners have 'a duty to maintain their property in a reasonably safe condition' such that

the 'foreseeable conduct of third parties on the property [is prevented] from intentionally

harming or creating an unreasonable risk of harm to others.'" (second alteration in original)

(quoting *Murray v. Nazareth Reg'l High Sch.*, No. 20-CV-1471, 2022 WL 3139116, at *3

(E.D.N.Y. Aug. 5, 2022))); *Murray*, 2022 WL 3139116, at *3 (quoting *Peralta v. Henriquez*, 100

N.Y.2d 139 (2003)); *Poly Prep*, 2022 WL 4586237, at *11 ("[I]t is the duty of a property owner

'to protect plaintiff from foreseeable harm caused by third persons,' including its own

employees." (quoting *PB-36 Doe v. Niagara Falls City Sch. Dist.*, 152 N.Y.S.3d 242, 246 (Sup.

Ct. 2021))); *C.Q. v. Est. of Rockefeller*, No. 20-CV-2205, 2021 WL 4942802, at *6 (S.D.N.Y.

Oct. 21, 2021) ("[A]n owner of realty has a duty to maintain its property in a safe condition[,]

which includes undertaking minimal precautions to protect the public from reasonably

foreseeable criminal acts of third persons." (alterations in original) (quoting *Polomie v. Golub

Corp.*, 640 N.Y.S.2d 700, 701 (App. Div. 1996))).

 Plaintiff has plausibly alleged that Defendants had a duty to Plaintiff as landowners.

Plaintiff alleges that he "was an invitee at the school/church premises where he was assaulted,"

where he "participat[ed] in the programs and activities Defendants offered to minors," (SAC

¶¶ 45, 61, 109), Defendants owned, occupied, and controlled the school/church property at all

16

relevant times, (*id.* ¶¶ 107–108), and therefore Defendants owed Plaintiff a duty to provide adequate security and supervision over the premises, (*id.* ¶ 110).  *See LaFrantz*, 2024 WL 216718, at *4 (finding that the plaintiff sufficiently alleged that the defendants had a duty as landowners because the plaintiff alleged that "she participated in programs and activities [the d]efendants offered to minors and ran errands for [the priest] that included meeting him at the rectory" and it was "reasonable to expect [the p]laintiff to be on [the defendants'] property — even outside of school or church hours — such that the [d]efendants owed her a duty" (citing *C.Q.*, 2021 WL 4942802, at *6)).  Drawing all inferences in Plaintiff's favor, Plaintiff's allegations suggest that he regularly frequented Defendants' property and the sexual abuse occurred repeatedly on the property for years, Defendants knew or should have known of Father Capua's propensities, (*supra* section II.c.i.2), and Defendants had the opportunity to control Father Capua, as demonstrated by Defendants' transfer and eventual termination of Father Capua, (SAC ¶¶ 14–15, 39); *Maurizi*, 2022 WL 1446500, at *14 (finding that the plaintiff sufficiently alleged a negligence claim against a defendant because (1) some of the plaintiff's abuse occurred at the ice rink owned by the defendant, (2) plaintiff sufficiently alleged that the defendant was aware of the alleged abuser's "nefarious behavior," and (3) the defendant "eventually terminated [the alleged abuser] because of repeated reports of abuse thus demonstrating [the defendant] had control over [the alleged abuser]").  Accordingly, the Court finds that Plaintiff has plausibly alleged that Defendants owed him a duty as landowners.

## 2.   Breach

Plaintiff has sufficiently alleged that Defendants breached their landowner duty to Plaintiff.  Plaintiff alleges that "throughout the time Father Capua sexually abused [Plaintiff], Defendants' agents and employees . . . suspected the abuse that was occurring, because Plaintiff would be pulled from class and taken to Father Capua," and "instead of helping Plaintiff, they

took no action and allowed the abuse to continue." (SAC ¶ 47.) Because Plaintiff alleges that the sexual abuse continued for years without any action taken by Defendants, the Court finds that Plaintiff plausibly alleges that Defendants breached their duty as landowners to "control the conduct of third persons on their premises." *Maysonet*, 906 F.2d at 931 (quoting *D'Amico*, 71 N.Y.2d at 85); *Maurizi*, 2022 WL 1446500, at *14 (quoting same).

### 3. Harm arising from breach

As discussed above, (*supra* section II.c.i.3), the Court finds that Plaintiff has plausibly alleged that he "suffered injuries proximately resulting from [Defendants'] breach." *Coyle*, 954 F.3d at 148. Accordingly, the Court denies Defendants' motions with respect to Plaintiff's negligence claims.

### d. Negligent training, supervision, and retention claims

St. Bernadette argues that the May 1959 Letter "does not identify or specify any misconduct" and therefore could not have given St. Bernadette notice that Father Capua had engaged in prior misconduct "of the same kind" that caused Plaintiff's injury, as required for a negligent training, supervision, and retention claim. (St. Bernadette's Mem. 10.)

The Diocese argues that, "[e]ven if the [May 1959 Letter] could be construed as an allegation that [Father] Capua was a 'bad priest' in charge of 'youngsters' who acted immorally by being 'first to the side of 13–16 year old boys,' that would still be insufficient to provide the Brooklyn Diocese with notice that [Father] Capua had a propensity for sexual abuse" because "[t]he letter does not provide an allegation of sexual abuse against [Father] Capua," (Diocese's Mem. 15–16), and "[t]o put an employer on notice, the prior misconduct 'must be of the same kind that caused the injury; general, unrelated or lesser allegations of prior wrongdoing are insufficient,'" (*id.* at 16 (quoting *Doe v. Alsaud*, 12 F. Supp. 3d 674, 681 (S.D.N.Y. 2014))).

Plaintiff argues that he adequately alleges the elements for negligent training, supervision, and retention because "(1) Father Capua was supervised, controlled, and employed by the Diocese and St. Bernadette; (2) at a minimum, Defendants' priests, nuns, employees, and agents were on notice of Father Capua's sexual propensities and/or acts of child sexual abuse[;] and (3) the incidents of abuse occurred in a parish owned and operated by Defendants."  (Pl.'s Opp'n 16 (citations omitted).)

To state a claim for negligent training, supervision, or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019) (quoting *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004)); *see also Doe v. Montefiore Med. Ctr.*, 598 F. App'x 42, 43 (2d Cir. 2015) (same); *see also Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 94 (2d Cir. 2011) (same).  "New York courts have held that in the context of sexual assault allegations, 'a plaintiff must in its complaint provide factual allegations concerning the tortfeasor's propensity for sexual assault, as well as factual allegations suggesting that the defendant knew or should have known of any such prior acts by the tortfeasor.'" *LaFrantz*, 2024 WL 216718, at *5 (first quoting *C.Q.*, 2021 WL 4942802, at *9; and then citing *Alsaud*, 12 F. Supp. 3d at 680).  Such prior misconduct "must be of the same kind that caused the injury." *Id.* (quoting *Alsaud*, 12 F. Supp. 3d at 681); *Zanghi v. Laborers' Int'l Union of N. Am.*, 778 N.Y.S.2d 607, 608 (App. Div. 2004) ("Those defendants may be held liable for the conduct of [their employee] only if they knew or should have known of [the

19

employee's] alleged violent propensities.  Furthermore, the propensities must be for the type of behavior that caused plaintiff's harm." (citation omitted)).

As discussed above with respect to Plaintiff's negligence claim, Plaintiff has plausibly alleged that Defendants knew or should have known of Father Capua's propensities for sexual abuse.  (*See supra* section II.c.i.2.)  However, Plaintiff has failed to allege that Defendants were aware of any specific prior acts of sexual abuse or sexual misconduct by Father Capua.  *See LaFrantz*, 2024 WL 216718, at *5 (dismissing the plaintiff's negligent training, supervision, and retention claim because the plaintiff "failed to allege any prior sexual abuse — let alone any prior history at all — on the part of [the priest]"); *Poly Prep*, 2022 WL 4586237, at *8 (dismissing the plaintiff's negligent hiring, supervision, retention, and direction claim because the amended complaint "does not contain any allegation that [the d]efendant was aware of specific acts or allegations of sexual abuse by [the employee] prior to the alleged abuse of [the p]laintiff" and "does not even allege that [the employee] had in fact ever engaged in — or even been accused of — sexual abuse before the alleged abuse of — [the p]laintiff"); *Murray*, 579 F. Supp. 3d at 390 ("[A]n employer is only liable for negligent supervision if the employer is aware of *specific* prior acts or allegations against the employee."); *Alsaud*, 12 F. Supp. 3d at 682 (collecting cases).  Accordingly, the Court grants Defendants' motions with respect to Plaintiff's negligent training, supervision, and retention claims.

### e.   Gross negligence claim

St. Bernadette argues that Plaintiff "fails to identify any intentional or reckless actions on behalf of the Parish, as is required for a claim for gross negligence."  (St. Bernadette's Mem. 12.)

The Diocese argues that Plaintiff's gross negligence claim fails because the underlying negligence claim fails.  (Diocese's Mem. 20.)

Plaintiff alleges that Defendants "deliberately turned a blind eye, covered up, and/or condoned the incidents of abuse" which "smacks of intentional wrongdoing" and "evinces a reckless disregard to the rights of others."  (Pl.'s Opp'n 15 (citations and alterations omitted).)

"Gross negligence is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing."  *AT&T Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (citation and internal quotation marks omitted); *see also Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (citation omitted); *LaFrantz*, 2024 WL 216718, at *5 ("Gross negligence, like ordinary negligence, requires breach of a legal duty," but "the alleged conduct must be of an 'aggravated character' that 'evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998))).  "Recklessness in the context of a gross negligence claim means 'an extreme departure from the standards of ordinary care,' such that 'the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Bayerische*, 692 F.3d at 61 (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009)).  While conclusory allegations of gross negligence may be dismissed for failure to state a claim, *see D'Amico v. Waste Mgmt. of N.Y., L.L.C.*, No. 18-CV-6080, 2019 WL 1332575, at *8–9 (W.D.N.Y. Mar. 25, 2019) (collecting cases), "statements of intentional wrongdoing often present fact issues inappropriate for disposition at this early stage," *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*, 405 F. Supp. 3d 408, 449–50 (W.D.N.Y. 2019) (collecting cases); *see also C.M. v. Est. of Archibald*, No. 20-CV-751, 2022 WL 1030123, at *8 (S.D.N.Y Apr. 6, 2022) ("Since [the p]laintiff has plausibly alleged that [the employer] was on notice of [the alleged abuser]'s propensity to sexually abuse vulnerable children yet continued to allow [him] unfettered and unchaperoned access to children within [the employer]'s care, a jury could find that [the employer] showed 'a reckless disregard for the rights of others' verging on 'intentional wrongdoing.'" (quoting *AT&T*, 83 F.3d at 556)); *PC-41*

21

*Doe*, 590 F. Supp. 3d at 569 (declining to dismiss the plaintiff's gross negligence claim "given, for

example, the number of alleged incidents of abuse, [the d]efendants' alleged knowledge of at least

some of those abuses, [the alleged abuser]'s alleged 'unfettered access' to students, [the p]laintiff's

allegation that he continued to be abused on school premises after reporting his abuse, [the

p]laintiff's allegation that the school 'failed to have in place' sufficient measures to monitor,

supervise, or oversee students' interactions with [the alleged abuser], and [the p]laintiff's allegations

that [the d]efendants did not meaningfully investigate or respond to accusations of abuse" (citations

omitted)); *but see LaFrantz*, 2024 WL 216718, at *5 (dismissing the plaintiff's gross negligence

claim because, although "the allegations as pled could support negligence on the part of the

[d]efendants," the court disagreed that the defendants "deliberately ignored [the priest]'s conduct"

and found that the plaintiff "failed to allege any intentional wrongdoing on the part of the

[d]efendants").

  Drawing all inferences in Plaintiff's favor, Plaintiff has plausibly alleged that

Defendants' employees knew or should have known of Father Capua's propensity for sexual

abuse but allowed him to spend time alone with Plaintiff multiple times a week for nearly seven

years, (SAC ¶¶ 5, 6, 45–47), and allowed him to maintain his position as a teacher to minor

children, (*id.* ¶¶ 9–11, 16, 34).  If proven, a jury could find that such conduct "evinces a reckless

disregard" for Plaintiff's rights and constitutes "an extreme departure from the standards of

ordinary care."  *See Bayerische Landesbank*, 692 F.3d at 61 (citations omitted); *C.M.*, 2022 WL

1030123, at *8; *PC-41 Doe*, 590 F. Supp. 3d at 570.  Accordingly, the Court denies Defendants'

motions to dismiss Plaintiff's gross negligence claims.

  **f.   Premises liability claim**

  St. Bernadette argues that Plaintiff has not alleged that it had any awareness of Father

Capua's "alleged propensity for sexual misconduct or that the misconduct was foreseeable."  (St.

Bernadette's Mem. 13.)  St. Bernadette also argues that Plaintiff's premises liability claim is "duplicative" of Plaintiff's other claims.  (*Id.* at 14.)

The Diocese argues that Plaintiff has not alleged that it owed a duty to Plaintiff, and that even if such a duty existed, "it did not know, nor could it have known, of [Father] Capua's propensity to commit sexual assault or that he posed a danger to Plaintiff."  (Diocese's Mem. 19.)

Plaintiff argues that Defendants "maintained a special relationship with [Plaintiff] as an invitee on property they owned and operated," (Pl.'s Opp'n 11), and had "a duty to protect [him] as property owners," (*id.* at 23).  He contends that Defendants "fail[ed] to exercise reasonable care to safely manage the priests under their employ, direction, and control," (*id.* at 11), and breached their duty to Plaintiff by "allowing Father Capua to work at St. Bernadette's where he had unfettered access to meet, groom, and molest [Plaintiff] in a vestibule area of St. Bernadette," (*id.* at 23).

The Second Circuit has stated that "[t]wo claims are duplicative of one another if they 'arise from the same facts . . . and do not allege distinct damages.'"  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (alteration in original) (quoting *Sitar v. Sitar*, 854 N.Y.S.2d 536, 538 (App. Div. 2008)); *see also Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) ("Under New York law, claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 49–50 (App. Div. 2010))); *Alan L. Frank L. Assocs. v. OOO RM Inv.*, No. 17-CV-1338, 2020 WL 7022317, at *18 (E.D.N.Y. Nov. 30, 2020) ("'[I]t is not the theory behind a claim that determines whether it is duplicative,' but rather the conduct alleged and the relief sought." (quoting *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010))).

Plaintiff's premises liability claim is duplicative of his negligence and gross negligence claims.  Plaintiff alleges that Defendants provided "inadequate security and supervision over the premises despite the existence of unreasonable risk of harm from abusive personnel."  (SAC ¶ 110.)  He alleges that Defendants' inadequate supervision was "a proximate cause of [his] injuries and the resulting damages [he] seeks."  (*Id.* ¶ 112.)  Plaintiff's allegation that Defendants failed to properly supervise their employees and their interactions with the minor students thus "arise[s] from the same facts" as his claims for negligence.  *NetJets Aviation, Inc.*, 537 F.3d at 175 (quoting *Sitar*, 854 N.Y.S.2d at 538).  Plaintiff also does not "allege distinct damages" for these claims.  *Id.*  Plaintiff's premises liability claim is therefore duplicative of his other negligence claims.  *See, e.g.*, *LaFrantz*, 2024 WL 216718, at *6 (dismissing the plaintiff's premises liability claim as duplicative of her negligence claims because her "assertions that [she] was an invitee at the [d]efendants' premises where [the d]efendants provided inadequate security and supervision such that the risk of harm was foreseeable, fall entirely within the scope of her negligence claims" (citations omitted)); *PC-41 Doe*, 590 F. Supp. 3d at 570 (sustaining the plaintiff's claims for negligence, negligent hiring, retention, and supervision, gross negligence, and willful misconduct, but dismissing the plaintiff's claims for negligent infliction of emotional distress, premises liability, and breach of duty *in loco parentis* as duplicative of those cognizable negligence claims); *C.Q.*, 2021 WL 4942802, at *4 (dismissing, in a CVA case, the plaintiff's premises liability claim as duplicative, but ruling that the plaintiff's claims for negligence, negligent retention and supervision, and gross negligence all survived the defendants' motions to dismiss); *Fay v. Troy City Sch. Dist.*, 151 N.Y.S.3d 642, 643 (App. Div. 2021) (dismissing, in a CVA case, the plaintiff's premises liability and negligent infliction of emotional distress claims as duplicative of negligence claims, but sustaining separate causes of action for negligence and negligent supervision and retention).  Accordingly, the Court dismisses this claim as duplicative.

24

### g.   Breach of fiduciary duty claim

St. Bernadette argues that Plaintiff fails to plead his breach of fiduciary duty claim with the required particularity because Plaintiff has not alleged a fiduciary relationship between himself and the parish and that in any case, this claim is duplicative of Plaintiff's other negligence claims.  (St. Bernadette's Mem. 14–16.)

The Diocese argues that Plaintiff fails to allege any breach of fiduciary duty because "there is no fiduciary relationship writ large between the Brooklyn Diocese and its parishioners." (Diocese's Mem. 21–23.)

Plaintiff argues that Defendants had a fiduciary duty to him based on its "*de facto* control and dominance over [Plaintiff] in his capacity as a minor parishioner," (Pl.'s Opp'n 24), and that Defendants breached that duty by "hiding and keeping secret the fact that there were persons at the school to whom Plaintiff would be subjected that engaged in sexual abuse of minors," "failing to disclose both before and after the events at issue in this case Defendants' knowledge of the abuse and the abuser," "failing to disclose the policy of covering-up past incidents of abuse," and "putting the interest of Defendants ahead of students and victims like [Plaintiff] by continuing to this day to hide the full extent of the problem," (SAC ¶ 124.)

"To state a breach of fiduciary duty claim under New York law, a plaintiff must plead: '(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.'"  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011)); *see also Blanton v. Educ. Affiliates, Inc.*, No. 21-1221, 2022 WL 1505124, at *4 (2d Cir. May 12, 2022) (same). To allege a fiduciary duty between a parishioner and a church, a plaintiff "may not merely rely on the church's status in general, but must come forward with facts demonstrating that his or her relationship with the institution was somehow unique or distinct from the institution's

relationship with other parishioners generally." *LaFrantz*, 2024 WL 216718, at *6 (quoting *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (App. Div. 2005)); *see also Doe v. Roman Cath. Diocese of Rochester*, 12 N.Y.3d 764, 765–66 (2009) ("[I]n order to demonstrate the existence of a fiduciary duty between a cleric and a congregant . . . 'a congregant must set forth facts and circumstances in the complaint demonstrating that the congregant became uniquely vulnerable and incapable of self-protection regarding the matter at issue." (quoting *Marmelstein v. Kehillat New Hempstead: Rav Aron Jofen Cmty. Synagogue*, 11 N.Y.3d 15, 22 (2008))); *Caroleo v. Roman Cath. Diocese of Brooklyn*, No. 519979/2019, 2021 WL 1667172, at *8 (N.Y. Sup. Ct. Apr. 28, 2021) (noting that "a fiduciary relationship is not applicable to all parishioners"); *Bouchard v. N.Y. Archdiocese*, No. 04-CV-9978, 2006 WL 1375232, at *6 (S.D.N.Y. May 18, 2006) (observing that the "general relationship" between a congregant and their church "is insufficient in law to support the finding of a fiduciary duty").

Plaintiff has not plausibly alleged a fiduciary relationship between himself and Defendants based on his status as a parishioner.  Plaintiff argues that Defendants "exercised additional de facto control and dominance over [Plaintiff] in his capacity as a minor parishioner, which created a fiduciary relationship beyond Defendants' established duties to [him] as a student."  (Pl.'s Opp'n 24.)  Plaintiff alleges his general relationship with Defendants "arising from his attending the Defendants' school and participating as an altar boy in the Defendants' church," (SAC ¶ 114), but does not allege the existence of a "unique" relationship between Plaintiff and Defendants.  Plaintiff therefore fails to allege a fiduciary relationship with Defendants based on his status as a parishioner.  *See LaFrantz*, 2024 WL 216718, at *6 ("Generalized allegations of a relationship by nature of [the p]laintiff's attendance at [the d]efendants' school and participation in church are precisely the types of claims courts have held insufficient to state a claim for breach of fiduciary duty." (collecting cases)); *C.Q.*, 2021 WL 4942802, at *4 (dismissing the plaintiff's breach of

26

fiduciary duty claim because he pled "no facts from which [a court could] infer any sort of uniqueness" with respect to his relationship with the defendant); *K.G. v. N. Am. Old Roman Cath. Church*, No. 504288/2020, 2023 WL 1801007, at *7 (N.Y. Sup. Ct. Mar. 1, 2023) ("By simply alleging that a fiduciary duty arose because [the p]laintiffs were minors and under the supervision and care of [the d]efendants, [the p]laintiffs have failed to state a cause of action for breach of fiduciary duty."); *Caroleo*, 2021 WL 1667172, at *8–9 (dismissing the plaintiff's breach of fiduciary duty claim because it failed to plead a fiduciary relationship between himself and the church); *Digiorgio v. Roman Cath. Diocese of Brooklyn*, No. 520009/2019, 2021 WL 1578326, at *7 (N.Y. Sup. Ct. Apr. 22, 2021) (same).

### III.  Conclusion

For the foregoing reasons, the Court (1) denies Defendants' motions as to Plaintiff's negligence and gross negligence claims, and (2) grants Defendants' motions as to Plaintiff's negligent training, supervision, and retention; premises liability; and breach of fiduciary duty claims.

Dated: March 28, 2024
       Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

27