**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PASQUALE J. GUERRIERO,<br><br>        Plaintiff,<br><br>v.<br><br><br>DIOCESE OF BROOKLYN ET AL.,<br><br>        Defendants. | 1:21-cv-04923-MKB-LKE |

**DECLARATION OF ASHLEY M. PILEIKA IN SUPPORT OF PLAINTIFF'S MOTION
TO STRIKE AND EXCLUDE THE OPINIONS AND TESTIMONY OF
ALEXANDER S. BARDEY, M.D. AND LASHONDA T. GREEN, PSY.D.**

I, Ashley M. Pileika, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

I, Ashley M. Pileika, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney duly admitted to practice before the courts of the State of New York and this Court. I am employed by the Law Office of Darren Wolf, P.C., counsel for Plaintiff Pasquale J. Guerriero. I make this Declaration based upon my personal knowledge, my involvement in this matter, and my review of the files maintained by my office in the ordinary course of business.

2.      I submit this Declaration in support of Plaintiff's Motion to Strike and Exclude the Opinions and Testimony of Dr. Alexander S. Bardey, M.D. and Dr. LaShonda T. Green, Psy.D.

3.      On September 16, 2025, Plaintiff served his Rule 26(a)(2) expert disclosures, including the expert report of Plaintiff's retained psychologist, Sara Liebert, Psy.D. Attached hereto as **Exhibit 1** is a true and correct redacted copy of Dr. Liebert's report.

1

4.      Dr. Liebert's report contains sensitive psychiatric, medical, and personal information concerning Plaintiff, including information regarding his mental-health history, psychological symptoms, treatment history, and the effects of the childhood sexual abuse at issue in this action. Plaintiff will move to file the unredacted report under seal and submit a redacted version for the public docket in order to protect his substantial privacy interests in that information.

5.      On October 7, 2025, Defendants advised Plaintiff that Defendant Diocese of Brooklyn had retained psychiatrist Alexander S. Bardey, M.D. to conduct an independent psychiatric examination of Plaintiff.

6.      On October 10, 2025, the Diocese of Brooklyn served Defendants' Rule 26(a)(2) expert disclosures, identifying Dr. Bardey as the sole retained expert designated to provide a rebuttal expert report pursuant to Rule 26(a)(2)(B). Attached hereto as **Exhibit 2** is a true and correct copy of Defendants' October 10, 2025 Rule 26(a)(2) expert disclosure.

7.      On November 24, 2025, the Diocese of Brooklyn served Defendants' expert report, which was jointly authored by Dr. Bardey and LaShonda T. Green, Psy.D.

8.      A true and correct copy of the joint Bardey-Green report was previously submitted to the Court under seal in connection with Plaintiff's Motion to Strike and accompanying Motion to Seal. See ECF Nos. 104, 104-2, and 105; Order dated January 6, 2026.

9.      On March 30, 2026, Plaintiff's counsel, Darren Wolf, took the deposition of Dr. Bardey. Attached hereto as **Exhibit 3** is a true and correct copy of the transcript of Dr. Bardey's March 30, 2026 deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2026.                          By:    */s/ Ashley M. Pileika*
                                                              Ashley M. Pileika

**CERTIFICATE OF SERVICE**

I, Ashley M. Pileika, hereby certify that a copy of foregoing was filed electronically through the ECF system and will be sent electronically to any registered participants as identified on the Notice of Electronic Filing (NEF) on June 5, 2026.

Dated: June 5, 2026              By:    */s/ Ashley M. Pileika*
                                        Ashley M. Pileika

# EXHIBIT 1



**Psychological Evaluation of Pasquale Guerriero**
**Pasquale Guerriero vs. Diocese of Brooklyn, Shrine Church of St. Bernadette**
Case Number 21-cv-04923-MKB-LKE

**Reason For Referral**

The current psychological evaluation of Pasquale Guerriero (DOB October 25, 1954) was requested by Ms. Ashley M. Pileika an attorney from the Law Office of Darren Wolf, P.C. As alleged in his complaint in this lawsuit, Mr. Guerriero asserted that he has suffered, and continues to suffer, various forms of emotional distress as a direct result of alleged sexual abuse that occurred between ages 7-12, at the hands of [then, since defrocked] Father Nicholas Capua. Father Capua was a priest serving in the Archdiocese of Brooklyn from 1956 to 2005. During his tenure at the Shrine Church of St. Bernadette (1961-1967), which also housed a parochial school, Father Capua regularly called upon elementary-aged altar boys, including Mr. Guerriero, to assist him in religious services, such as morning Mass, confession, and sacramental rites.

The current evaluation was requested to examine Mr. Guerriero and perform a comprehensive forensic psychological evaluation to establish his general psychological functioning and if he evidenced symptomology consistent with DSM-5-TR diagnoses or subsyndromal conditions. By extension, should such symptomology be present, the evaluation was to evaluate any functional impairments Mr. Guerriero was experiencing as a result of his mental illness, and to what extent, if any, the sexual abuse by Father Capua that occurred at St. Bernadette's Church was a contributing factor to his illness and resulting impairment. The examination occurred in person on July 26 and 27, 2025, as well as via telehealth sessions on July 31, 2025, and August 25, 2025.

**Sources Of Information**

1. Clinical Evaluation:
    a. In-person clinical interview of Pasquale Guerriero on July 26, 2025, for 5.5 hours
    b. In-person clinical interview of Pasquale Guerriero on July 27, 2025, for 2hours
    c. Video clinical interview of Pasquale Guerriero on July 31, 2025, for 1 hour
    d. Telephonic clinical interview of Pasquale Guerriero on August 26, 2025, for 1 hour
2. Collateral Interviews
    a. Telephonic interview with ███████, Mr. Guerriero's sister, on August 1, 2025, for 25 minutes
    b. Telephonic interview with ███████, Mr. Guerriero's former classmate, on August 1, 2025, for 45 minutes
3. Records/Documents Reviewed:
    a. Second Amended Complaint, dated August 24, 2022
    b. Deposition of Mr. Guerriero, dated October 31, 2024
    c. Plaintiff's objections and supplemental interrogatory responses, dated August 5, 2025
    d. Mr. Guerriero's Military Record

    e.   Mr. Guerriero's Academic Record from St. Bernadette's Church

    f.   Father Capua's Employment File

4. Assessment Tools:

a.       Minnesota Multiphasic Personality Inventory-3rd Version (MMPI-3)

b.       Personality Assessment Inventory (PAI)

c.       Trauma Symptom Inventory-2nd Version (TSI-2)

d.       Structured Inventory of Malingered Symptomatology (SIMS)

e.       Weschler Abbreviated Scale of Intelligence (WASI)

f.       REY-15

## Assessment Procedures

The procedures used in this evaluation adhere to the ethical standards[1] of the American Psychological Association (APA), including the Specialty Guidelines in Forensic Psychology (SGFP)[2]. This evaluation is considered a forensic evaluation, which differs from a clinical assessment in focus. It is important to note that while forensic evaluations consider the clinical presentation, there is a heavier burden on forensic evaluators to understand not only the clinical picture, but how clinical presentations relate specifically to the psycho-legal issue [e.g., whether the reported event(s) created impact and whether that impact in turn resulted in functional impairment or significant symptomology].[3]

## Evaluation Structure

At the beginning of the first appointment, the undersigned conducted the informed consent process, which explained the nature and purpose of the evaluation. Mr. Guerriero was encouraged to ask questions and raise concerns. The undersigned differentiated a forensic evaluation from a psychotherapy session, including addressing the purpose and procedures, limits to confidentiality, communication with parties, and the fees for the evaluation and testimony. The undersigned explained that she would obtain information through record review, forensic interview, collateral interview (if consent is provided), psychological testing, and direct observation. The undersigned then explained that all data points would be synthesized to formulate opinions and recommendations related to the present lawsuit.

---

[1] American Psychological Association (2002). Ethical principles of psychologists and code of conduct. *American Psychologist, 57,* 1060- 1073; American Psychological Association. (2017). Ethical principles of psychologists and code of conduct (2002, Amended June 1, 2010 and January 1, 2017). Retrieved from http://www.apa.org/ethics/code/index.aspx

[2] American Psychological Association. (2013a). Specialty Guidelines for Forensic Psychology. *American Psychologist, 68(1),* 7-19

[3] Heilbrun, K., Grisso, T. & Goldstein, A. (2008). Foundations of Forensic Mental Health Assessment. NY, NY: Oxford University Press; Melton, G. B., Petrila, J., Poythress, N. G., Slobogin, C., Lyons, P. M., & Otto, R. K. (2007). Law and the mental health professions: An uneasy alliance. Psychological evaluations for the courts: A handbook for mental health professionals and lawyers (3rd ed., pp. 3-25). New York, NY: Guilford Press; Packer, I. K., & Grisso, T. (2011). Specialty competencies in forensic psychology. Chapters 1, 2, and 3. New York: Oxford University Press.

Liebert Psychological Services        2
917.268.7665
www.liebertpsychologicalservices.com

The undersigned then explained that upon completion of the evaluation, she would integrate the information into a written report, which would be provided to the legal representation for the retaining party. The party would then determine whether to submit the report to the court. Mr. Guerriero was notified that this examiner could be asked to testify about the findings of the evaluation and that her testimony would include opinions about the referral issue. After completing the informed consent process, Mr. Guerriero confirmed that he had a thorough understanding of the purpose and procedures, agreed to the limits of confidentiality, and confirmed that all of his questions and concerns had been adequately addressed. He then signed a written agreement to participate in the evaluation.

**Relevant Background Information**





### Clinical Interview of Pasquale Guerriero

The following information was collected via in-person clinical interviews and psychological testing on July 26, 2025, and July 27, 2025, for 7.5 hours, and via telehealth on July 31, 2025, and August 26, 2025, for 2 hours, as well as collateral interviews with Mr. Guerriero's sister and a former classmate from St. Bernadette's.

### Mental Status

Mr. Guerriero was evaluated in person and via teleconference for a total of approximately 9.5 hours across one month. Across all interviews, Mr. Guerriero was well-groomed and dressed in clothing that was appropriate to the weather and evaluation context. Throughout the interview process, he presented with a full range of affect. For instance, when discussing his pets, memories of his late wife, or professional achievements, Mr. Guerriero's affect was bright. However, when talking about his brother's (untimely) death or his experiences of sexual abuse, Mr. Guerriero appeared more withdrawn, averted eye contact, and attempted to change the conversation topic, noting feelings of emotional overwhelm. He spoke at a normal rate, rhythm, and volume and displayed no verbal tics. Mr. Guerriero's thought process was primarily linear and logical. However, at times, he would become tangential but responded well to redirection and clarifying questions posed by the undersigned. He also experienced some difficulty with time sequencing and memory recall. This did not appear to be an attempt to obfuscate the truth but rather a genuine minor memory or attentional impairment. Mr. Guerriero expressed no bizarre or delusional beliefs. He did not endorse any recent changes in appetite or recent/current feelings of hopelessness, thoughts of death/dying, suicidal ideation, thoughts of non-suicidal self-injurious behavior, or violent ideation.

### Childhood, Family, and Religious History







**Relationship and Sexual History**



**Military and Employment History**



**Medical and Mental Health**



**Aggressive Behaviors and Legal History**

**Reported Sexual Abuse by Father Capua**







## Psychological Testing

The Personality Assessment Inventory (PAI) is a 344-item, norm-referenced, objective measure of psychological functioning. It is written at a fourth-grade level. It is considered a highly reliable and valid measure designed to assess individuals across 11 clinical scales, five treatment scales, and two interpersonal scales, thereby informing clinical formulations and developing appropriate, individualized treatment interventions. There are also four validity scales embedded within the measure to assess how well an individual paid attention to content, responded randomly, how forthcoming an individual was in their approach, or whether attempts were made to appear overly positive or overly negative, with additional scales to assess response style. Scales are non-overlapping and seek to assess for both breadth and depth of experience. All the scales on the PAI have a mean T score of 50 and a standard deviation of 10T. The PAI was used to provide additional data about response patterns, mental health symptoms, and other information relevant to the reason for referral.

Mr. Guerriero's response pattern to the PAI indicated some concern for inconsistent responding, which could suggest confusion in his interpretation of test items. However, he did not attempt to portray himself in an overly positive or negative light [INC=67T; INF=59T; NIM=47T; PIM=48T]. Thus, Mr. Guerriero's clinical profile should be considered an accurate representation of his current functioning. His PAI profile suggests that he is experiencing mild depressive symptoms, which are most pronounced in his cognitive self-appraisals. Mr. Guerriero was prone to being self-critical, blaming himself for prior mistakes or missed opportunities, and had longstanding beliefs of self-doubt and inadequacy. Mr. Guerriero has few close relationships, and he prefers to keep others at a psychological and emotional distance, as most social interactions result in feelings of distress. These concerns were consistent with his self-report in the above interview [DEP-C =64T; DEP-A=69T; SCZ-S=79T]. Moreover, Mr. Guerriero's results had no indications of antisociality or egocentricity [ANT-A= 61; ANT-E= 45].

The Minnesota Multiphasic Personality Inventory-3 (MMPI-3) is a 335-item norm-referenced objective measure of personality. It is written at a 4.5 grade reading level and, akin to the PAI, is a highly valid and reliable measure of psychological functioning. The MMPI-3 has ten validity and 12 clinical (three higher-order and nine restructured clinical scales) that are employed to assess the respondent. The validity scales assess for response style, how well an individual paid attention to the test questions, the frequency of their responses (compared to the norming sample), and whether the respondent attempted to portray themselves in an overly positive or negative light. The clinical scales encompass a wide range of psychological and personality functioning. All of the scales on the MMPI-3 have an average T score of 50 and a standard deviation of 10T. The

MMPI-3 was used to provide additional data about response patterns, mental health symptoms, and other information relevant to the reason for referral.

The MMPI-3 profile suggests that Mr. Guerriero understood all test items and responded in a straightforward, consistent, and candid fashion. There are no indications that he attempted to portray himself in an overly negative or positive way [CRIN=48T; VRIN=51T; TRIN=54T; L=56T; K=50T]. Similar to his PAI profile and stated affective experiences, Mr. Guerriero's MMPI-3 profile indicates that he has minimal close relationships, as he feels uncomfortable with others and prefers his own company [DSF-71 T]. It also reflects his reported historical suicidal ideation [SUI=58T] and a lack of antisocial behaviors [RC4 = 50T].

The Trauma Symptom Inventory-2 (TSI-2) is a 136-item tool designed to measure a wide range of traumatic and related symptomology (e.g., depression, anger, anxiety, dissociation, somatization, insecure attachment, etc.) secondary to experiencing possibly traumatic events. The TSI-2 includes two validity scales, 12 clinical scales, 12 subscales, and four factors. Scores on the TSI-2 are reported as T-scores, with a mean of 50. T-scores between 60 and 64 suggest experiences within the problematic range, while T-scores higher than 65 are considered clinically elevated.

Based on Mr. Guerriero's responses on the TSI-2, both validity scales were in the acceptable range [RL=56; T ART=53T]. He endorsed significant symptoms consistent with defensive avoidance, meaning that he actively attempts to avoid, distract, or prevent distressing memories and thoughts from entering his mind [DA=62T]. Additionally, his results indicate that he is wary of interpersonal relationships, as they bring about a sense of discomfort, and, as a result, he tends to keep others at an emotional distance [IA-RA=66T]. Lastly, Mr. Guerriero's results showed that he experiences feelings of hopelessness and passive suicidal ideation, such as wishing he were dead or having thought about ending his own life. It is important to note that in this assessment and upon direct questioning, Mr. Guerriero denied active suicidal ideation or a plan to harm himself. [SUI=69T; SUI-I=71T; SUI-B=48T].

The Wechsler Abbreviated Scale of Intelligence – Second Edition (WASI-II) is a standardized measure of intellectual functioning designed for use with individuals aged 6 through 90 years. The WASI-II provides a reliable, efficient estimate of general intellectual ability. The test includes four subtests (Vocabulary, Similarities, Block Design, and Matrix Reasoning), which yield Verbal Comprehension, Perceptual Reasoning, and Full-Scale IQ indices. The average index score is 100, with a standard deviation of 15. The test can be administered in approximately 30 minutes.

The WASI-II found no concerns regarding Mr. Guerriero's intellectual functioning. His abilities across all indices are in the average range [VCI = 107; PRI = 102; FSIQ = 105]. These results suggest that Mr. Guerriero was exerting appropriate effort and attention with the testing procedures and does not have any significant cognitive impairments.

The Rey 15-Item Memory Test is a brief measure commonly used to assess effort and response validity in neuropsychological and forensic evaluations. The test consists of 15 simple stimuli (letters, numbers, and geometric figures) presented for immediate recall. Because the items are organized in easily recognizable patterns, most individuals without significant cognitive

impairment can recall at least nine items. Performance substantially below expectation may suggest suboptimal effort, exaggeration of deficits, or feigned memory problems, particularly when inconsistent with other cognitive findings.

Mr. Guerriero was able to recall all 15 items on the REY-15. While only one brief measure, his result suggests that he was exerting appropriate effort and not attempting to distort his memory abilities. Thus, when taken together, Mr. Guerriero's REY-15 and WASI-II scores indicate that he has average intellectual functioning, does not have indications of attentional impairments, and understood all testing and evaluation procedures.

The Structured Inventory of Malingered Symptomatology (SIMS) is a 75-item, true-or-false screening instrument that assesses both malingered psychopathology and neuropsychological symptoms across five commonly malingered or embellished domains [psychosis, neurologic impairment, amnestic disorders, low intelligence, and affective disorders]. The SIMS renders a total score and domain-specific scores. The SIMS is written at a 5th-grade reading level and takes individuals approximately 10-15 minutes to complete.

Mr. Guerriero's SIMS profile found that his overall score was not elevated or indicative of feigning. However, his profile noted moderate elevations on the psychosis and affective subscales and a significant elevation on the neurologic impairment subscale. His amnestic and low intelligence subscales were not elevated. It is essential to remain cognizant that the SIMS is a screening tool used as a component of a comprehensive evaluation, and subscale elevations in isolation are not indicative of malingering. As the elevations above did not align with the rest of Mr. Guerriero's assessment data or clinical presentation, the undersigned completed an item-level analysis. While it is impossible to conclude definitively, it appears that the domain elevations were a byproduct of carelessness, evaluation fatigue, misunderstanding the question, and elevated emotional distress given the context of administration rather than a genuine attempt to be deceitful, especially when considered within the totality of his other test results (e.g., acceptable scores on the WASI and REY-15 and lack of malingering concerns on the PAI or MMPI-3).

**Summary and Impressions**

According to Mr. Guerriero, he and his three siblings were raised in a devoutly religious home, where they were taught to obey all church authorities implicitly. He described his father as warm and loving, but in addition to his misuse of alcohol, he often worked long hours, rendering his mother, whom he described as strict and emotionally withholding, the primary caregiver. Given these dynamics, Mr. Guerriero did not feel he had a supportive parental base to whom he could confide or rely on. To satisfy his own spiritual needs and in an attempt to win over his mother's affection, Mr. Guerriero self-selected to become an altar boy at St. Bernadette's Church from second to seventh grade, where he served under Father Capua, who sexually abused (exposing his genitals, forcing Mr. Guerriero to perform fellatio, and pressing his erect penis into Mr. Guerriero's buttocks) him numerous times over his tenure as an altar boy within the church. Though he began to feel increasingly distressed by this behavior in third grade, he did not resign from his altar boy duties as he knew church involvement was important to his family, and given his young age, he did not yet fully understand that he was being victimized. Mr. Guerriero stated Father Capua would request that he stay in the church after services or call him into the church from the adjoining school to ensure privacy. As he was seven years old when the abuse began, Mr. Guerriero did not

yet have an awareness that what Father Capua was doing was exploitative, a fact that was further mired by his role as a priest, given Mr. Guerriero's admiration and deference to clergy. This, in tandem with the absence of a stable parental attachment, helped cultivate an environment that allowed Father Capua to abuse him for years, and only ended when the family moved.

Mr. Guerriero stated that around middle childhood, he began to pull away from his peer group, noting he did not want to allow anyone to get too close. He stated that this pattern continued throughout his adolescence and much of his adult life, wherein he would keep relationships (platonic, professional, and romantic) at a distance. Upon entering adolescence, Mr. Guerriero recalled the emergence of pervasive anger, leaving the Catholic Church, and feelings of sexual confusion during puberty, and chronic shame and self-blame manifested by cognitions of "why me" or "I should have done something different to stop him [Father Capua]. To contend with this constellation of symptoms, Mr. Guerriero turned to alcohol and cannabis as a means of self-medication. During this period, Mr. Guerriero also struggled with impulse control, which manifested in his dropping out of high school in 11th grade [though he later earned a GED], and entering into a relationship and subsequent 'shotgun' wedding at age 19. His difficulties with anger management and impulse inhibition are also correlated with the dissolution of his first marriage and a strained relationship with his son.

Mr. Guerriero went on to have an ostensibly successful career in the military and within the private sector. However, he continued to struggle with impulsivity, anger, and depressive episodes, resulting in one inpatient hospitalization, a two-year course of outpatient treatment, and long-term use of antidepressant medication. Additionally, he continues to experience ongoing shame, sexual difficulties, emotional withdrawal, and avoidance, which began in middle childhood.

**Psychological Functioning and Possible Related Diagnoses**
Mr. Guerriero's clinical presentation is consistent with Posttraumatic Stress Disorder (PTSD) with delayed expression and Persistent Depressive Disorder (PDD). Mr. Guerriero has experienced significant and long-standing anxious, depressive, and traumatic symptom sequela beginning in adolescence. His individual symptom presentation included: headaches, persistent depressed mood, suicidal ideation, avoidance, feelings of low self-worth, shame and guilt, impulsivity, chronic anger, irritability, intrusive ideation, sexual dysfunction, and trepidation around connecting deeply to others. While no account beyond his self-report was available of his psychological functioning before the sexual abuse by Father Capua began at age seven, given his family constellation, it can reasonably be assumed that some of these symptoms predate the sexual abuse. However, there is a clear trajectory between the abuse and worsening of existing symptoms and the development of additional symptomology.

Mr. Guerriero's early experiences of an emotionally distant mother, in tandem with abuse at the hands of Father Capua, set the template for expectations of others in relationships. In Mr. Guerriero's case, the schema that emerged was that even purportedly safe and trusted people can perpetrate harm, and by extension, trust and emotional openness can lead to vulnerability and exploitation. Thus, in an attempt at self-preservation, he began to emotionally distance himself from his family and friends. However, by closing himself off, he was not able to have positive, corrective experiences with others, and thus, his beliefs became more entrenched. This tendency to push others away, unintentionally reinforced cognitive distortion regarding his poor sense of

self-esteem and self-worth, hence further perpetuating negative affectual states of anger, sadness, and sexual confusion. Without a social support network to rely on, Mr. Guerriero attempted to assuage his distressing internal experience via avoidance of distressing thoughts and memories and externalizing actions such as self-medication and aggression/ fighting. While this provided transient relief, Mr. Guerriero continued to experience a negative sense of self, intense feelings of shame, hyperarousal, and active avoidance of thinking about or talking about his abuse (even with medical providers). When doing so, he experienced ideation regarding Father Capua's genitals and emotional distress.

While Mr. Guerriero has participated in therapy and long-term use of antidepressant medication to address his symptomology, he did confide in the provider about his trauma history. This was not done with the intention of being deceitful. Mr. Guerriero sought inpatient and outpatient psychological care on numerous occasions in his adult life to address his complex mental health needs. However, due to well-developed avoidance skills, shame, and his embedded beliefs regarding deference to church leaders, he was unable to share his victimization. To date, Mr. Guerriero has not had the benefit of trauma-focused interventions specific to his experiences of sexual abuse by Father Capua.

**Possible Functional Impairment**
Despite the significant symptomology noted above, Mr. Guerriero was able to excel professionally and maintain a 40-year marriage. However, Mr. Guerriero struggled with a negative self-concept, depressed mood, impulsivity, hyperarousal, sexual problems, and impaired interpersonal relationships beginning in middle childhood. The tangible culmination of this resulted in one inpatient hospitalization, a two-year course of outpatient therapy, and the use of an antidepressant medication since 2005. Beyond that, the presence of these symptoms, which are in large part due to sexual abuse by Father Capua, Mr. Guerriero's quality of life, sense of trust, ability to connect with others, and emotional comportment were negatively impacted.

## FORENSIC OPINION
Based on the totality of information from the current evaluation (e.g., record review, psychological testing, clinical interview, collateral interview, and an integration of the data), it is clear that as a result of chronic sexual abuse by Father Capua during his formative years, Mr. Guerriero was significantly negatively impacted. These impacts, among others, include impaired interpersonal relationships, reticence in trusting others, chronic hyperarousal, and intrusive ideation. While Mr. Guerriero's home life may have made him more susceptible to subsequent victimization, there is a clear indication that the intensity and scope of symptoms he experiences are directly related to the sexual abuse at St. Bernadette's.

It is strongly recommended that Mr. Guerriero participate in trauma-focused therapy with a professional specializing in sexual abuse to help him address and process his experiences. Additionally, it is recommended that Mr. Guerriero complete a psychiatric evaluation to determine if escitalopram remains the best medication or if another medication may be more effective in managing his symptoms.

Thank you for the opportunity to assist in this matter.  I would be glad to provide any additional clarification if desired.

Respectfully submitted,

*Sara Liebert*

Sara Liebert, PsyD
Clinical and Forensic Psychologist

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PASQUALE J. GUERRIERO, | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :     Case No.: 21-cv-04923-MKB-JRC <br> : |
| DIOCESE OF BROOKLYN, SHRINE CHURCH OF ST. BERNADETTE, | : <br> : <br> : |
| Defendants. | : |

## THE BROOKLYN DIOCESE'S RULE 26(a)(2) EXPERT DISCLOSURE

In accordance with Federal Rule of Civil Procedure 26(a)(2), Defendant The Roman Catholic Diocese of Brooklyn, s/h/a Diocese of Brooklyn (the "Brooklyn Diocese"), by and through its attorneys, Kelley Drye & Warren LLP, hereby disclose the Brooklyn Diocese's expert witness:

Dr. Alexander S. Bardey, MD
Fifth Avenue Forensics
303 Fifth Avenue, Suite 403
New York, NY 10016

Dr. Bardey's rebuttal Rule 26(a)(2)(B) expert report will be submitted following receipt of Plaintiff's affirmative expert report, and in accordance with the Court's Order dated August 4, 2025, or other such date as agreed-upon by the parties and/or ordered by the Court.

The Brooklyn Diocese reserves the right to amend, revise, or supplement this disclosure, including after the close of fact discovery, and at any time prior to the trial of this matter. The Brooklyn Diocese further reserves the right not to call this witness or issue a report. Moreover, the Brooklyn Diocese reserves the right to call as a witness at trial any employee of the Brooklyn Diocese to testify about any issues of fact or expert subject matter for its case-in-chief or rebuttal of any testimony offered by Plaintiff.

In addition, the Brooklyn Diocese reserves the right to call as a witness at trial any expert designated, identified, or called to testify on Plaintiff's behalf, and to call any expert to rebut any testimony offered by Plaintiff.

Dated:   New York, New York
       October 10, 2025

KELLEY DRYE & WARREN LLP

By: _____
    Michael C. Lynch
    Randall L. Morrison, Jr.
    Ashley Czechowski
    Edwin A. Herod

    3 World Trade Center
    175 Greenwich Street
    New York, New York 10007
    Tel.: (212) 808-7800
    Fax: (212) 808-7897
    mlynch@kelleydrye.com
    rmorrison@kelleydrye.com
    aczechowski@kelleydrye.com
    therod@kelleydrye.com

    *Attorneys for the*
    *Brooklyn Diocese*

2

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

_____

PASQUALE J. GUERRIERO,

      Plaintiff,

  v.                    Case:

DIOCESE OF BROOKLYN,          1:21-cv-04923-MKB-JRC

SHRINE CHURCH OF

ST. BERNADETTE,

      Defendants.

_____

VIDEOTAPED DEPOSITION

_____

WITNESS:               ALEXANDER BARDEY, M.D.

DATE:                  Monday, March 30, 2026

START TIME:           10:10 a.m. ET

END TIME:             11:34 a.m. ET

REMOTE LOCATION:      Remote Legal Platform

PROCEEDINGS OFFICER:   DANA ALARCON, HH-601380

JOB NO.:              47990

A P P E A R A N C E S

LAW OFFICE OF DARREN WOLF, P.C.

1701 North Market Street

Suite 210

Dallas, Texas 75202

By:  DARREN WOLF, ESQUIRE

        darren@darrenwolf.com

By:  ASHLEY M. PILEIKA, ESQUIRE

        ashley@darrenwolf.com

Appearing for Plaintiff


KELLEY DRYE & WARREN LLP

3 World Trade Center

175 Greenwich Street

New York, NY 10007

By:  EDWIN ADLAM HEROD, ESQUIRE

        therod@kelleydrye.com

By:  ASHLEY CZECHOWSKI, ESQUIRE

        aczechowski@kelleydrye.com

By:  MEGAN WEITEKAMP, ESQUIRE

        mweitekamp@KelleyDrye.com

Appearing for Defendant Diocese of Brooklyn

A P P E A R A N C E S (CONT.)


SCAHILL LAW GROUP P.C.

1065 Stewart Avenue

Suite 210

Bethpage, New York 11714

By:  MALACHY LYONS, ESQUIRE

     mlyons@scahillpc.com

Appearing for Defendant Shrine Church of St.

Bernadette



INDEX OF TESTIMONY

EXAMINATION OF ALEXANDER BARDEY, M.D.:                    PAGE

By Mr. Wolf                                                10

By Mr. Herod                                              49

I N D E X   O F   E X H I B I T S

(available for download)

EXHIBIT    DESCRIPTION                                    PAGE

1          Dr. Bardey's IME Report                         31

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties that the presence of the Referee be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved until the time of trial;

IT IS FURTHER STIPULATED AND AGREED that this deposition may be utilized for all purposes as provided by the Federal Rules of Civil Procedure;

AND FURTHER STIPULATED AND AGREED that all rights provided to all parties by the Federal Rules of Civil Procedure shall not be deemed waived and the appropriate sections of the Federal Rules of Civil Procedure shall be controlling with respect thereto.

FEDERAL REMOTE STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys of record for all parties to the above-entitled action, that:

Pursuant to Rule 30(b)(4) of the Federal Rules of Civil Procedure, this deposition will be conducted by remote videoconference with the oath being administered remotely and a court reporter creating an accurate written record; that, if necessary, the parties agree that each witness can be identified with picture identification;

No attorney, nor any party or witness, shall capture any still photographs, nor record, by video or audio, any part of these deposition proceedings;

Each attorney agrees to instruct their witness that there is to be no communication with anyone outside of the identified and participating group, by chat, text, email, or other means during the deposition;

There shall be no other person in the room with the witness during their deposition;

Any phone or electronic device in the room with a witness shall be identified and not read, referred to, or otherwise used during the witness' deposition, unless agreed to by all counsel on record.

P R O C E E D I N G S

THE PROCEEDING OFFICER:  All right.  Good morning.  We are now on the record.  Today's date is March 30th, 2026, and the time is approximately 10:10 a.m. Eastern Time.  My name is Dana Alarcon, and I'm the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the deposition of Dr. Alexander Bardey, taken in the matter of Guerriero v. Diocese of Brooklyn, et al., Case number 21-CV-04923-MKB-LKE (sic), filed in the United States District Court Eastern District of New York.

Would all counsel please identify themselves for the record and state who they represent, starting with the noticing attorney?

MR. WOLF:  Yes.  Darren Wolf here for Plaintiff.

MS. PILEIKA:  Ashley Pileika for Plaintiff.

MR. HEROD:  This is Edwin Herod with Kelley Drye & Warren for Defendant, the Brooklyn Diocese.

MS. CZECHOWSKI:  Ashley Czechowski on behalf of the Brooklyn Diocese as well.

MS. WEITEKAMP:  Megan Weitekamp from Kelley Drye & Warren, also on behalf of the Brooklyn Diocese.

MR. LYONS:  Malachy Lyons, Scahill Law Group, for Shrine Church of St. Bernadette.

THE PROCEEDING OFFICER:  Thank you.  This deposition is being taken remotely on behalf of the plaintiff and is being conducted pursuant to the procedural rules and laws governing this matter.  As such, all parties agree to this means of capturing the official record, which may include recording by audio, audiovisual, and/or stenographic means, and agree not to oppose admissibility of the testimony in this proceeding on the basis of the personnel or method by which the testimony was captured.  Further, all parties agree that the proceedings officer or person administering the oath may be authorized to administer the oath under the rules where they reside.

Do the parties so stipulate?

MR. WOLF:  Plaintiff stipulate.

MR. HEROD:  The Brooklyn Diocese stipulates.

MR. LYONS:  So stipulated.

THE PROCEEDING OFFICER:  Thank you.

And, Dr. Bardey, would you please state

and spell your full name for the record?

DR. BARDEY:  Sure.  Alexander, A-L-E-X-A-N-D-E-R, Bardey, B-A-R-D-E-Y, M.D.

THE PROCEEDING OFFICER:  Thank you.  And would you please raise your right hand?  Do you solemnly swear or affirm that the testimony you shall give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

WHEREUPON,

A L E X A N D E R   B A R D E Y,  M. D.

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDING OFFICER:  Thank you.

And, Counsel, you may proceed.

EXAMINATION

BY MR. WOLF:

Q    Good morning, Dr. Bardey.  I'm Darren Wolf. Do you understand who I am and what we're doing here today?

A    I do.

Q    And you've had your deposition taken before?

A    I have.

Q    And did you review any documents or speak to any attorneys in preparation for this deposition?

A    Yes.

Q    And can you name those documents?

A    Sure.  I reviewed the -- my report in the matter dated November 24th, 2025.  I reviewed the initial complaint, response to interrogatories.  I reviewed various medical records.  I reviewed the expert report prepared by Dr. Liebert and, more recently, a, I guess, an affirmation written by the plaintiff and a letter of follow-up letter written by Dr. Liebert.  In addition --

Q    And -- oh, go ahead.

A    -- in addition to reviewing those materials, I also spent about 15 minutes on the phone with Mr. Herod several days ago.

Q    And what was discussed on that call?

A    Just what was going to happen --

MR. HEROD:  Object to --

You can answer to the extent that this does not involve attorney-client conversation.

BY MR. WOLF:

Q    Well, hold on.  Hold on.  Based on that objection does Mr. Herod or his firm represent you?

A    No.

MR. WOLF:  Okay.  Then I would ask Mr. Herod, do you have a different objection?

MR. HEROD:  Mr. Wolf, Dr. Bardey is our expert, and as an agent of the firm, the conversations are privileged and subject to work-product protection.

MR. WOLF:  So is it your position that you don't represent Dr. Bardey, but since he's your expert, that your communications are attorney-client privileged?

MR. HEROD:  That's correct.

MR. WOLF:  Okay.

BY MR. WOLF:

Q    Mr. Bardey, can you tell us what -- everything, every single thing that was discussed with Mr. Herod during that 15 minutes?

A    Sure.  Let me just correct you.  My name -- my name is Dr. Bardey.  So if you could call me by that title, I would appreciate it.  Thanks.

Q    I'm sorry, I didn't know.  What did I just call you?

A    Mr. Bardey.

Q    Yes, Dr. Bardey.  My -- I -- no, I did not mean any disrespect by that.  Your name comes up Alexander Bardey on my screen here.  And so yeah, I did -- I surely didn't mean any disrespect to that, so thank you for reminding me.

A    None taken.  None taken, believe me.

MR. HEROD:  And now objection.

Do not answer that question, Dr. Bardey.

MR. WOLF:  I'd like it to be on the record that Dr. Bardey is refusing to answer question about conversations he has had prior to this deposition in preparation for this deposition.  He is refusing to answer what he discussed, even though he is not represented by counsel here under the objection of attorney-client privilege.

BY MR. WOLF:

Q    Did you talk to anyone else in preparation for this deposition?

A    No.

Q    Okay.  Any other -- any -- when I say anyone else, including lawyers, colleagues, anyone?

A    No.

Q    Dr. Bardey, what -- you -- you've given your deposition, you mentioned, at least or over 30 times; is that -- that's correct?

A    Correct.

Q    And what does that mean?  When you say over 30 times, is it 31 or 300, or can you give us a better approximation?

A    It would be somewhere between 30 and 40, I believe.

Q    Okay.  So pretty close.  Okay.  And were those for the defendant or plaintiffs in cases?

A    Both.

Q    And what percentage was for the defendant and what was for the plaintiff?

A    I couldn't give you an exact number.

Q    Okay.  You think -- well, okay, if you -- I don't want you guessing.  Dr. Bardey, what is Fifth Avenue Forensics?

A    It's a DBA for my professional limited liability company, Alexander S. Bardey, M.D., PLLC. It's essentially my forensic psychiatric practice that I founded a number of years ago.

Q    So you own the -- you own Fifth Avenue Forensics?

A    That is correct.

Q    Okay.  And how many people do -- does Fifth Avenue Forensics employ?

A    About 14.

Q    And what are the -- what are the job titles of those folks, those 14 people?

A    Sure.  At least three of them are psychologists, clinically licensed psychologists; two are social workers; and two are licensed mental health counselors.  One is a master's level psychologist and

then the balance are support or administrative staff.

Q    What does administrative staff do?

A    One answers the phones in my office, one does the billing and the requesting of medical records, and one oversees their work.

Q    Okay.  That still leaves about three or four. What do those other people do?

A    I have -- I have three psychologists who are on -- who are independent contractors who work for me when I need -- when I have too much work and I need to spill over, I then bring them in.

Q    Anyone else?

A    No, sir.

Q    And the -- you and the other providers that work at Fifth Avenue Forensics, do you and the others report to any professional licensing groups to regulate your practice?

A    Well, as a psychiatrist, I am -- my work -- I -- I guess, my licensure is overseen by the American Psychiatric Association and the New York State Educational Department.  My board certification is overseen by the American Board of Psychiatry and Neurology.  The psychologists have a similar relationship with their board, the American Psychiatric Association, and have equal responsibilities in terms of

maintaining their license with their -- the licensing agency, and the same is true of the social workers and the licensed therapists.

Q    When -- who -- when were you asked to participate in this case?

A    In the fall of 2025.

Q    And who contacted you about your participation in this case?

A    I believe it was Attorney Randall Morrison.

Q    And what did Mr. Morrison hire you to do?

A    To perform an independent medical examination of Pasquale Guerriero in light of his lawsuit against the archdiocese wherein he is claiming psychological damages as a result of the alleged sexual abuse he encountered while a student there.

Q    Did Mr. Morrison engage you to determine if Mr. Guerriero had, in fact, been sexually abused?

A    No.

MR. HEROD:  Objection.

BY MR. WOLF:

Q    At any point during this case, has it been part of your job to determine if Mr. Guerriero was sexually abused as a child?

A    No.

Q    Dr. Bardey, can you -- and am I pronouncing

that right?  Is it bar-day?

A    You are.

Q    Okay.

A    Perfect.  Thank you.

Q    You.  Can you tell us what kind of provider is Dr. Green?

A    She is one of my psychologists.

Q    Okay.  And she's trained to do psychological evaluations, I'm assuming?

A    Yes.

Q    And she has a doctorate; is that correct?

A    Correct.

Q    Okay.  And that's a PsyD, which is a -- that's, I guess, a newer one after the PhD --

A    Correct.  It -- it's a --

Q    Doctorate?

A    -- doctorate that's more aligned with clinical work and less aligned with research.

Q    Okay.  So she's good that -- Dr. Green's good to get in and figure out what's wrong with people as opposed to working with lab rats.

          Would that be a fair example?

             MR. HEROD:  Objection.

             THE WITNESS:  No.  In both cases, whether you're a psychologist with a PhD or a psychologist with

a PsyD you're working with people, it's just what kind of work you're doing with people.  In other words, the process of becoming a PhD involves much more time spent in doing research with human beings whereas the PsyD is -- is more targeting clinical skills to either treat or evaluate individuals.

BY MR. WOLF:

Q    Okay.  And, you know, pardon my ignorance on that, because I remember a long time ago when I was in undergrad and I almost went to the PhD program at TCU and they were -- they were all messing with lab rats, but I think, you know, it was probably something to, you know, see if those rats salivated when they rang the bell and, like, you know, I guess, people do, too.  So I don't know.  That was probably just something at my school, so pardon my ignorance on that.

But, basically, you're saying that Dr. Green is a -- she's a clinical person.  In other words, she's going to be, you know, in with the people not doing necessarily experiments, but analyzing their behaviors.  Is that fair to say?

A    That is fair to say.

Q    Okay.  And you mentioned that you had done about 200 or more than 200 IMEs; is that correct?

A    Yes, sir.

Q    Okay.  And are those -- when you say 200 IMEs, are those for involving lawsuits?

A    Correct.

Q    Okay.  And have you worked for any of these lawyers that are involved in this case?  Have you worked for any of them before this case?

A    No.

Q    What about the law firm?  Have you worked for the -- any of these law firms before this case?

A    You'd have to remind me of the full name of each of the law firms and I would then be better able to answer your questions precisely.

Q    Well, there's a few different ones or a couple of different ones, I'm sorry, and I don't want to mess the names of them, so let me, let me -- one is called Kelley Drye & Warren.

       Do you remember ever working for them before this case?

A    I have not.

Q    Okay.  And then Scahill Law firm?

A    I have not worked for them before either.

Q    Okay.  And you've never worked for my firm, Law Office of Darren Wolf, correct?

A    Correct.

Q    And when you -- when you were hired to do this

case, what's your hourly -- what -- what's your hourly rate?

A    $700 an hour.

Q    Okay.  And then for this deposition, is it a flat rate or how is that billed?

A    I'm not sure what my billing department did in this case.  It -- if it's a half day, we bill as a half day.  If it's a full day, we bill as a full day.

Q    Okay.

A    I don't remember what arrangements were specifically made here.

Q    Okay.  So -- I'd like to --

MR. WOLF:  Ashley, can you help me pull up, if you're still there, the report in just a second. I'm going to go to that in just a second, but not right this minute.  If -- I don't know if you've got that downloaded or if I need to do it on this end.

MS. PILEIKA:  Yeah, do you want his report?

MR. WOLF:  Yeah.  Yeah.  Dr. Bardey's report, but don't -- I don't want it yet, but if --

MS. PILEIKA:  Yeah.

MR. WOLF:  -- if you got it ready in case and for -- in just a minute.  Okay.  Perfect.  Thank you.

MS. PILEIKA:  Yeah.

THE WITNESS:  Mr. Wolf, may I ask you a quick question?

BY MR. WOLF:

Q    Sure.

A    Sure.  The only piece of paper I have in front of me is my report.  Do you want me to keep it here or put it away?

Q    No, if you could keep it there, that'd be great.

A    Okay.

Q    Yeah, because I'm going to ask you a few questions about that.

A    Sure.

Q    And, Dr. Bardey, since you've done 200 of these, at least, and been in depositions, do you have a general understanding that when someone asks for an -- a medical examination that, that is something that requires disclosure of who is performing the medical examination?  Is that in -- within your range of understanding?

MR. HEROD:  Objection.

THE WITNESS:  Of course.

BY MR. WOLF:

Q    And also that not only who is performing it,

but what is going to be done?  In other words, the type of examination, the type of testing, and that sort of thing.  Is that -- you understand that?

MR. HEROD:  Objection.

THE WITNESS:  Yes.

BY MR. WOLF:

Q    Now, when you do an IME or medical examination, I'll call it, you don't have any doctor-patient relationship with these people you examine; is that correct?

MR. HEROD:  Objection.

THE WITNESS:  Yes.

BY MR. WOLF:

Q    And so if you examine this someone and you get it wrong, there's no consequences for you, correct?

MR. HEROD:  Objection.

THE WITNESS:  Consequences for me or consequences for the client or patient?

BY MR. WOLF:

Q    Consequences for you, Doctor.

A    There are no law -- there are no medical liability consequences, but there could be other professional consequences.

Q    And like what would those be?

MR. HEROD:  Objection.

THE WITNESS:  Issues of reputation.

BY MR. WOLF:

Q    And would that be the same for Dr. Green?

MR. HEROD:  Objection.

THE WITNESS:  If she were doing her own evaluation, yes, it would be.

BY MR. WOLF:

Q    Okay.  So Dr. Bardey, if I could turn to your -- you said you had it in front of you, your forensic psychiatric evaluation.  I'd like to ask you a few questions about that.

Do you have that in front of you?

A    I do.

Q    Okay.  Let's see if we can pull that up.  And I may can click on the exhibits and pull it up here.

MR. WOLF:  Oh.  Thank you, Ashley.

BY MR. WOLF:

Q    Okay.  This is nice.  I've never used this platform.  Okay.  So Dr. Bardey, is this what you're seeing here, do you recognize that document?

A    Well, that's the first page of my report, yes.

Q    Okay.  And here at the top here, Randall Morrison, you mentioned his name before is the person that hired you.  Is that -- do you recognize that?

A    I do.

Q    And then it looks like you've written this report to Mr. Morrison, that's correct?

A    Correct.

Q    Okay.  Now, can you read that first sentence after, "Dear Mr. Morrison"?  Can you read that first sentence for the jury?

A    Sure.  "At your request, we (Alexander S. Bardey, M.D., and LaShonda T. Green, Psy.D.) performed an independent and impartial psychiatric evaluation of Mr. Pasquale J. Guerriero in connection with Pasquale J. Guerriero vs Diocese of Brooklyn et al."

Q    And so it appears that here, you were hired, Mr. Morrison hired you, Dr. Alexander Bardey and LaShonda T. Green, Psych D, or Dr. Green, Psy.D., to perform this examination; is that correct?

MR. HEROD:  Objection.

THE WITNESS:  He hired me and I brought Dr. Green on board to assist me.

BY MR. WOLF:

Q    And did you indicate that in any -- to Mr. Morrison that Dr. Green was going to be in this room with -- performing this psychiatric evaluation?

MR. HEROD:  Objection.

THE WITNESS:  He was told that I would have, as I always do, an assistant with me who would

assist me with the evaluation and organizing some of the materials.

BY MR. WOLF:

Q    Dr. Bardey, can you point -- your report is, I'm not sure how many pages long, 30 pages long.  Can you -- can you point the jury to any place in there where this report says that Dr. Green was assisting you or was your assistant?

MR. HEROD:  Objection.

THE WITNESS:  Well, the -- the fact that I conducted the evaluation, I asked well over 99 percent of the questions, I indicated to Mr. Guerriero all of the limits of confidentiality, how the examination was going to progress, made it clear that this was my evaluation and that Dr. Green was simply assisting me.

BY MR. WOLF:

Q    So Dr. Bardey, you said you asked 99 percent of the questions.  Who asked 1 percent of the questions?

A    I believe Dr. Green asked one single question to clarify a point of fact.

Q    I appreciate you sharing that.  Now, back to my question, can you point the jury or the judge to one place in your 30-page report where you talk about Dr. Green assisting you, being your assistant as her role in this evaluation?

MR. HEROD:  Objection.

THE WITNESS:  I did in this report, what I do with all reports, where I name my assistant and they co-signed the report, but I don't specifically describe what role they play versus what role I play.  I -- I mentioned at -- at the beginning of the evaluation that this person, whether it's a psychologist, a social worker or a therapist, will be serving as my assistant.  So I make it clear that they have a secondary role.

BY MR. WOLF:

Q   And now, you're smarter than I am, Dr. Bardey, but your first sentence there, it says, "We performed an independent -- we performed an independent and impartial psychiatric examination."  Then it goes on to say, "We assessed current ability to function," and then we reviewed the records, "We performed a mental status examination."  We reviewed the following.

Are you asking this court to believe that we doesn't mean -- that it doesn't mean this report doesn't mean what it says?

MR. HEROD:  Objection.

THE WITNESS:  Absolutely not.  Absolutely not.  It's no different than if you think of a surgeon and the people assisting the surgeon during an operation, the -- the surgeon may very well write that

we, the team, performed the surgery, although he's the one or she's the one who led it and everyone else played a supporting role.

So it's very aligned with -- with that kind of teamwork where one person is -- is in charge, really, making the decisions and everyone else is just assisting the individual in getting the best possible result.

BY MR. WOLF:

Q    So a doctor who signed this said she performed an independent and impartial psychiatric evaluation is not true.  You performed it and she signed it and as a doctor?

MR. HEROD:  Objection.

BY MR. WOLF:

Q    Is that what you're saying?

A    What I'm saying is that she, as I wrote here, reviewed all the same materials I did.  She sat -- during my evaluation, she was able to also assess Mr. Guerriero's mental state, and I had her read the report before putting her name to it.  She agreed with my findings and, therefore, was willing to sign the report.

Q    And so by reading your report, how are we supposed to know that you -- that you did the report, you did the examination, and she was just your

assistant, because she signed it actually ahead of you here, and put her hourly rate.

A    Uh-huh.

Q    And, I guess, her rate is $500 for an assistant, but she signed it, you both signed it. There's nothing here that says it was your report, or her report, or both of you.  The way it's signed, it -- I would -- I would just like you to point me out how we can tell who's -- did the examination here in your report?

A    Well, it's --

MR. HEROD:  Objection.

THE WITNESS:  -- I think it's clear from -- even your client, in his letter, stated clearly that I'm the one who asked, essentially, every question during the evaluation.  So your -- your client had a very good understanding that I was the one conducting this evaluation and I'm the one who described what the evaluation would be like.

Dr. Green did not participate, other than playing a supporting role.  She would have participated more extensively if I had made the decision to have her do independent psychological testing.  In other words, whether I would want to repeat any of the psychological testing that Dr. Liebert did, then she would have then

contributed that to this evaluation.  She would've done her own psychological testing and would have then given me the results of those, which I then would've incorporated into my report.  That would've been clearly identified because that would've been a separate role that she played.

In this particular instance, I did not feel it necessary to have Mr. Guerriero undergo any additional psychological testing, so therefore, I told Dr. Green that there was no need for her to do any of that.

MR. WOLF:  I'm going to object as nonresponsive.

BY MR. WOLF:

Q   Doctor, I understand that you want to explain what went on in that room.  Unfortunately, we weren't there, the Court was not there, and we have our client that was there.  And we were presented required report here, and from this report, it clearly says that you and Dr. Green performed an evaluation and you both signed it.  And tell me how we're not supposed to believe what is in black and white writing, signed by you and Dr. Green?

MR. HEROD:  Objection.

THE WITNESS:  Well, that -- inasmuch as

she was in the room with me and reviewed the materials, then she did participate, but in a secondary role.

BY MR. WOLF:

Q    Would you agree that, if there's another doctor in the room with you, doing an independent examination of my client, that that should -- that doctor should have been disclosed before -- disclosed to us?  Just like you were, you were disclosed to us.  But this other doctor, Dr. Green, should've been disclosed.

MR. HEROD:  Objection.

THE WITNESS:  Dr. -- Dr. Green did not perform a -- an -- a separate, independent evaluation. The evaluation was done by me and Dr. Green, as other assistants have helped me.  She was available that day, other assistants were not.  She played the role of assistant.

Because she's a -- she has a title after her name and is a licensed practitioner, I did not want to not include her name to, hopefully, not make things more confusing, although apparently I have.

BY MR. WOLF:

Q    When you sent these to Defense Counsel did their -- did they -- did they -- was Dr. Green -- did they pay the bill for her work as well as yours?

A    No.

MR. HEROD:  Objection.

BY MR. WOLF:

Q    Did they tell you -- were you told that --
were you ever asked who Dr. Green is?

MR. HEROD:  Objection.

THE WITNESS:  I think -- I think only
after the issue was raised by you and the plaintiff.

THE PROCEEDING OFFICER:  I'm sorry, Mr.
Wolf, did you want to mark this as an exhibit?

MR. WOLF:  Let's do this as Exhibit 1.

THE PROCEEDING OFFICER:  Thank you.

(Exhibit 1 was marked for identification.)

MR. WOLF:  Thank you, Ms. Alarcon.

BY MR. WOLF:

Q    So I guess, to, kind of, wrap this document
up, it looks like -- do assistants always provide their
CVs in cases they've testified in?

MR. HEROD:  Objection.

THE WITNESS:  Not if they play the role
of assistants.

BY MR. WOLF:

Q    Okay.  And you're aware that Dr. Green
provided her CV and her cases she's testified in here?

A    I am.

Q    Okay.  You mentioned you reviewed the report

of Dr. Liebert; is that correct?

A    Yes.

Q    And in your report, you didn't take any issue with Dr. Liebert's findings; is that correct?

MR. HEROD:  Objection.

THE WITNESS:  I just summarized them.  I typically don't provide a critical analysis of the other expert.  I -- I usually leave that for trial.  I just simply want to make sure that it's clear that I've reviewed their findings.

BY MR. WOLF:

Q    And so when you reviewed the findings -- since you reviewed the findings, do you have any issue with Dr. Liebert's findings?

A    Yes.

Q    Okay.  And can you point, in your report, to where those -- where you have listed those?

A    I just testified that I typically don't list a critical analysis of the other experts, that I save that for trial, so it would not be in the report.

Q    Okay.  So it's your testimony that you reviewed Dr. Liebert's records, which you did outline in your report, but you left out anything where you don't agree with Dr. Liebert's findings.  Is that what you're telling us?

A    It's not --

MR. HEROD:  Objection.  Misstates.

THE WITNESS:  -- it's not that I left it out, it's that I chose not to include it for the reasons I just testified to.

BY MR. WOLF:

Q    Okay.  You chose not to include it because you wanted to bring that out for the first time at trial, is what you're saying?

MR. HEROD:  Objection.

THE WITNESS:  Yes.

BY MR. WOLF:

Q    Okay.  I noticed, in your report, you mentioned a lot of history that you went through.  Do you remember that?  It looks like -- if I can -- if you can turn to the one you have, I'll scroll up.  Whichever one is best for you.  Right here on, personal history.

A    Yeah.

Q    Sorry.  See what's going on here.  Personal history.  Yeah, right here.  And, you know, you outlined that there -- his life and things of that -- like that.  Did you review that before?

A    Yes.

Q    Okay.  And you took -- did -- you took those -- you got all those facts there from interviewing Mr.

Guerriero and the documents you reviewed?

A    Correct.

Q    Okay.  And did you find any issue with -- as far as Mr. Guerriero's truthfulness on what he was telling you about his history?  It looks like a lot of bad stuff here.

A    I believe he was truthful.

Q    Okay.  And do you believe he was truthful when he mentioned the sexual allegations against the priest?

MR. HEROD:  Objection.

THE WITNESS:  Again, it was not my role to determine the credibility of his claim, but his manner and his way of describing it was consistent with the way he described other events in his life.

BY MR. WOLF:

Q    Well, as a -- as a board-certified psychiatrist sitting here today, I mean, from your interview with him, do you believe he -- he's credible as to the allegations, not only against the priest, but all the other accounts here of his life?

MR. HEROD:  Objection.

THE WITNESS:  I thought he was generally credible.  Sure.

BY MR. WOLF:

Q    And in his -- in your conclusions -- let me go

down to that here.

MR. HEROD:  For the record, we cannot see whatever page you're on.

MR. WOLF:  Oh.  I'll tell you.  Bear with me.  Let me --

MR. HEROD:  All right.

MR. WOLF:  -- let me get to it.  I've got some notes here, but I'm trying to scroll properly on this thing and it's giving me a hard time here, Mr. Herod, so bear with me here.

BY MR. WOLF:

Q   So Dr. Bardey, it looks like I'm on page, let me see here, 10?  10, Page 10.

A   Okay.

Q   Let me make sure.  Oh, I'm sorry.  Let's -- okay.  It's at the bottom of Page 9.  That's where I -- my notes -- I was trying to start at the top of Page 9.  So about the middle of Page 9, Diagnosis and Formulation.  Do you see that?

A   I do.

Q   Okay.  So you noted he's had significant, in that second paragraph there, some significant life events.

A   Correct.

Q   And that, you know, that -- which reasonably

contributed to the emergence of whatever issues he's having.  You put, I think, "Chronic mood -- low chronic mood," here.

But the things you've listed here, would you agree -- let me find the -- like his childhood, getting beaten by his mother, his brother dying of AIDS, and things of that nature, that you left out being sexually abused for several years by the priest.  And so, would you agree, that would have a -- likely, more likely than not, have a negative impact on a -- on someone's life?

A    I would not.

Q    You wouldn't agree that being sexually abused for years would not have a negative impact on someone's life?

MR. HEROD:  Objection.

THE WITNESS:  That -- that's not -- that's not what I'm saying.  Of course sexual abuse can have a negative impact, but in this particular case there are numerous other significant traumatic experiences that he's undergone, which have equally, if not more, contributed to any psychological issues that he might have had then, over the course of -- of years, or currently.

BY MR. WOLF:

Q    So is it -- is it your testimony that -- or

from what I'm understanding, I guess it's your testimony that, since this man had a rough life after he was raped by the priest, that then, I guess, the church just got lucky that this guy had a bad life, because that's the reason for all his problems, and not being raped as a child?  Is that what you're trying to tell the jury?

MR. HEROD:  Objection.

THE WITNESS:  Absolutely not.

BY MR. WOLF:

Q   Okay.  Well, you're telling us, well, all these other things causes problems, but more so than the -- than the being raped as a child.  And I'm just trying to figure out, should that excuse what happened to him as a child or let the priest off the hook or the people that allowed this to happen off the hook?

MR. HEROD:  Objection.

THE WITNESS:  The decision to let various defendants off the hook is not mine.  That's the province of the trier of fact.  My responsibility, my job was to assess whether and to what extent Mr. Guerriero was suffering from any psychological issues, the causative agent of which could've been or would've been the years of sexual abuse that he claims to have endured.

My opinion is that Mr. Guerriero has

suffered a number of adverse experiences that both predate and post date the years during which he reported being sexually abused by Father Padua (sic), and it is the cumulative effect of all of those various stressors that have contributed to his current depressive symptomatology.  In fact, Mr. Guerriero himself, in his deposition, used the word, cumulative, to describe the impact of the various trauma that he had undergone and experienced in his life.

BY MR. WOLF:

Q    Dr. Bardey, you know, the jury's going to be looking at you to say, you know, we're asking for, as you've read here, and you included it in your report, as far as reading the complaint, you know, the things like that, the damages we're asking for.  So the jury's going to be looking to you for these damages, and so that's why I'm asking the question is, are you going to tell this jury that what happened to him with the priest was -- didn't cause him any problems, it -- all this other stuff and just disregard what happened with the priest?

MR. HEROD:  Objection.

THE WITNESS:  I mean, to his credit, Mr. Guerriero is a very resilient man.  And one aspect of assessing for psychological damages is to assess the degree to which the individual's psychological symptoms

are impacting on any of the various domains of

functioning.  I'm talking about, you know, social life,

educational life, vocational life, intimate life.  And

to his credit, Mr. Guerriero has not manifested

significant decrease or impairments in functioning in

any of the major areas of his life.  He even said that

very clearly in his deposition and during my evaluation,

which was further borne out by the psychological tests

administered by Dr. Liebert, which showed essentially

minimal findings.

BY MR. WOLF:

    Q    So is it your -- are you saying here that

because he has able to be, you know, able to do some

positive things in his life, that that childhood abuse

should be overlooked by the jury or disregarded?

              MR. HEROD:  Objection.

              THE WITNESS:  In terms of being a

significant causative effect of the mild depression he's

having now, the answer is yes.  The childhood abuse was

one of many different traumas that he underwent as a

child, in adolescence, and as an adult.  And all of

those, including the sexual abuse, contributed to his

suffering from what I diagnosed him as having a

persistent depressive disorder, which is a low level,

chronic form of depression.

BY MR. WOLF:

Q   And you have -- you have calculated that sex abuse into your conclusion without even determining if he was sexually abused; is that correct?

MR. HEROD:   Objection.

THE WITNESS:   That's -- that is true of any of the IMEs that I do.

BY MR. WOLF:

Q   So if you're not -- if you don't even know if he was sexually abused, how can you determine that something -- what other -- wouldn't that have an impact on things that followed after, under a clinical analysis?

MR. HEROD:   Objection.

THE WITNESS:   Well, that's why -- that's why it's important to get a full history and background of the individual to know if he's inherited any sort of propensity towards manifesting any psychiatric difficulties.  It's also important to review whether he's experienced any adverse childhood experiences during the formative years of his life to determine what impact, if any, those had.  It's important to assess whether the individual was abused by any party, and if it was, what the impact was.

You can usually check the impact by

trying to assess what the contemporaneous functioning of the individual was. If you see a significant drop in functioning at a moment in time that has then a lasting impact, then it's reasonable to assume that whatever event precipitated that sudden change in behavior may be a contributing factor. It's also important to review medical records, because if people are having psychological problems, they might seek help, they might be hospitalized, they might be in therapy or prescribed medications.

So a review of -- of those records helps to inform if there's a moment in time that things occurred or if there are alternative explanations for the psychological issues that the individual might be manifesting. It's important to review their -- their professional or work history to see what impact, if any, issues of their childhood or issues in their adulthood have negatively impacted on that. And I did all of those things in this case and was able to then come to the conclusion that I did.

BY MR. WOLF:

Q    But you never determined if Mr. Guerriero was sexually abused in order to factor that into your evaluation, correct?

MR. HEROD:  Objection.  Asked and

answered.

THE WITNESS:  That would have been inappropriate, especially in federal court where it's the job of the trier of fact to make that determination. But when doing my evaluation in this one or in any other examination, I've done a number of child victim act cases where the -- the same issue comes up, whether I'm working for one side or the other, is -- is that I assume the -- the sexual abuse occurred and then try to understand and ferret out what impact that abuse might have had.

BY MR. WOLF:

Q  So here, you agree that Mr. Guerriero was sexually abused, but it -- your testimony is it just, it didn't -- it didn't have any effect on him?

MR. HEROD:  Objection.

THE WITNESS:  No.  That's not what I testified to at all.  I didn't assume it occurred.  I -- I'm not saying it occurred.  I say for the purposes of the evaluation, I assume it occurred, and then when I did my analysis, I came to the conclusion that it was just one of several causative agents for his ongoing symptoms of mild depression.

BY MR. WOLF:

Q  Doctor, can you point us to any place in your

report where you -- where you indicate you assumed the sexual abuse occurred or that the sexual abuse did occur?

    A    No.

            MR. HEROD:  Objection.

BY MR. WOLF:

    Q    And can you show us anywhere in your analysis where you assumed the sexual abuse occurred or agreed that it occurred?

            MR. HEROD:  Objection.

            THE WITNESS:  Because I mentioned the sexual abuse in my formulation.  I'm not ignoring it.

BY MR. WOLF:

    Q    Would you agree, unlike the beating and the brother dying of AIDS, you referred to the sexual abuse as alleged sexual abuse?

    A    Correct.  Because it's not my responsibility to make that determination.

    Q    But you did make the determination that Mr. Guerriero had been beaten by his mother, had been -- his brother died of AIDS, his -- where his parents worked, and that he was in the military, et cetera, correct?

            MR. HEROD:  Objection.

            THE WITNESS:  None of those data points are before the trier of fact in this case, so it was

reasonable for me to accept his own recitation of his

prior history as being credible.  That's not something

that the -- the Court would have prevented me from

doing.

BY MR. WOLF:

Q    Dr. Bardey, would you agree all those issues

are going to be in front of the trier of fact because

the defendant here is alleging that all those things are

what's caused my client's problems and not the sexual

abuse?  So do you understand that all those things are

to be judged by the trier of fact?

MR. HEROD:  Objection.

BY MR. WOLF:

Q    If you don't understand that, that's fine.

I'm just asking you, do you understand that when there's

defenses that say, "Brother dying of AIDS, not the

priest raping me caused my problems."  Do you understand

that'll all be in front of the trier of fact?

MR. HEROD:  Objection.

THE WITNESS:  I understand that.

BY MR. WOLF:

Q    Okay.

A    I understand that.

Q    All right.  Have you understood all my

questions?

A    Those I did not, I think I asked you to -- to repeat or asked for clarification.

Q    Okay.

MR. HEROD:  Mr. Wolf, it's been about an hour.  Is now a good time to --

MR. WOLF:  Yeah.  I think I'm -- I think I'm wrapping it up here.  If you can give me just one minute to look over my notes, Mr. Herod.

MR. HEROD:  That, we can do.

MS. PILEIKA:  If we can just go off the record, Darren?

MR. WOLF:  Okay.

MS. PILEIKA:  So we can just chat quickly.

MR. WOLF:  Yeah.  Let me --

THE PROCEEDING OFFICER:  Off the record, 11:02 a.m.

(A recess was taken.)

THE PROCEEDING OFFICER:  All right. We're back on the record at 11:09 a.m.

BY MR. WOLF:

Q    All right.  Dr. Bardey, I'm about finished up here.  Just have a few follow-ups.  Was your examination, or was the examination that was described in your report here on Mr. Guerriero, was that recorded,

either the voice or video of any sort?  I'm sorry.  Your microphone's muted.  I'm not sure if you can hear me.

A    I'm sorry.  I'm so sorry.  The answer is no. It was not recorded in any form.

Q    Okay.  And can you -- how many drafts of this report were made before the one that we're looking at today?

A    It's -- it's not an issue of multiple drafts. It's -- it's one document that keeps getting updated, so it's not as though I'm saving separate drafts.

Q    And do you have the previous versions in your possession?

A    No, I do not.

Q    And where would someone find those if they wanted to read those?

A    Well, it's -- it's in the -- the software that I use is -- is called Microsoft Drive, and in Microsoft Drive, you edit -- you -- you edit a text and it auto saves to -- to the same version.  So as I said, it just, it's one report that just keeps getting edited and -- and not separately recorded or saved.

Q    And -- but how many times, since it edits that way, how many times was the report edited?

A    Well, as I -- I build it over time, in other words, I -- I first create the template, you know, for

the order and -- and the subsections.  I then -- I early on include all the introductory information, and then as I read records or as I -- after I completed my examination, you know, the -- the notes are then transcribed into a narrative form in the report.  The summary of records or the summary of discovery is -- is also then added, and then the mental status is added, and finally, the Diagnosis and Formulation is added at the end.  Once that's all complete, I usually leave it alone for a week or two, and then come back at it with fresh eyes, and then do more of a final -- a final edit, not so much for content, but for stylistic issues.  And usually after that, the -- the report is -- is in a form ready to be sent to the attorneys.

Q   And who drafted this?  Who drafted the first version of the first draft of the report?

A   I did.

Q   Did anyone else assist in drafting the report?

A   No.

Q   Did anyone review this report before it was sent to our law firm?

A   Sure.  Dr. Green reviewed it, as I said before.

Q   Okay.  Anyone else?

A   No.

Q    How did you provide the report to the attorneys that hired you?

A    Through email.

Q    Okay.  Do you still have -- I'm assuming you still have those emails?

A    I would.

Q    Okay.  Would you be willing to turn over those emails if you were asked, if your -- if me and your attorney can work it out?

MR. HEROD:  Objection.

THE WITNESS:  I -- I will follow the direction of -- of the -- the attorneys when they come to an agreement as to how such issues would be handled.

BY MR. WOLF:

Q    Okay.  All right.  And once again, have you understood my questions, Doctor?

A    I have.

MR. WOLF:  Okay.  Thank you for being here, Dr. Bardey.

I will pass the witness.

THE WITNESS:  Okay.  Can we take down the -- the sharing because I can't see some of you as a result of that?

MR. WOLF:  Oh, yes.

MR. HEROD:  Okay.  Dr. Bardey, I think if

you push the exhibits button now it will go away so you can see the full --

THE WITNESS:  Here we go.  You're right.

MR. HEROD:  -- screen.

THE WITNESS:  Thank you.

MR. HEROD:  Could we just take a ten-minute break?

MR. WOLF:  That's fine.  Mr. Herod, are you going to have any questions?

MR. HEROD:  I am.

MR. WOLF:  Oh, okay.  Okay.  Yeah.  Sure.

THE PROCEEDING OFFICER:  All right.  Off the record, 11:14 a.m.

    (Off the record.)

THE PROCEEDING OFFICER:  All right.  We are back on the record at 11:26 a.m.

                    EXAMINATION

BY MR. HEROD:

    Q    All right.  Thank you, Dr. Bardey, for your patience and cooperation today.  Earlier we were discussing informed consent.  Is it your common practice to obtain informed consent?

    A    I do it on each and every one of the cases I work on, whether it's an IME or a criminal matter. Regardless of which side I'm -- I'm working for, I have

a standard disclosure at the beginning of every evaluation where I go into detail about the nature and purpose of the evaluation, the limits of confidentiality, the fact that no doctor-patient relationship is being created, that I'm not there to treat them, prescribe medication, or do therapy, but I -- I am there to answer a very specific medical-legal language.

Q   Thank you.  And in this case, did you get informed consent from Mr. Guerriero?

A   I did.  And I ended my brief declaration about informed consent by asking the client if they have any questions about what I just said, or they need further explanation.  And in this case, Mr. Guerriero answered in the negative.

Q   Thank you.  And did you introduce Dr. Green to Mr. Guerriero?

A   I always introduce whoever is going to be in the room, whether that's a representative from one of the law firms or my assistant.

Q   Okay.  And who conducted the examination of Mr. Guerriero?

A   I did.

Q   Dr. Bardey, could you -- what is the precise language that you mentioned in the informed consent?

A    Sure.  So I'll -- I'll introduce myself: I'm Dr. Bardey.  You know, thank you for being on time.  We are here -- let's say this -- it's an IME.  We're here because you are alleging, through this lawsuit, that you suffered psychological damages as a result of the abuse that you stated you suffered from.  The defendants are exercising their right to have you evaluated, and so they reached out to me.  I'm not an employee of theirs, I'm an independent contractor.  So today we're going to do this independent medical examination.

The -- I need to inform you that, although I am a -- I'm a psychiatrist, a doctor, I'm not here to prescribe medication or do therapy.  I'm not here to be your doctor.  Ours is not a standard doctor-patient relationship and, more specifically, it means that what we talk about here isn't strictly private and confidential.  It will not be broadcast to the entire world, but certainly, if and when I write a report, those reports will go to the attorneys for -- your attorneys for the plaintiffs and the attorneys for the defendants, and possibly even the judge.  So you need to understand that what we talk about here is not private and confidential the way it would be if you were talking to your doctor.

What we're going to do today is, we're going

to start talking about your background, your early childhood history, your educational history, vocational history, social history, medical history, psychological history, substance use history, history of any legal entanglements, then we'll spend some time talking about the issue that brought us here.  In other words, your experiences that -- that you had at -- at the diocese, and then we'll explore in some detail the impact, if any, that that has had on you.

There is a chance, after you and I speak, that there will be some psychological testing done that'll be done by either this assistant or another assistant in my office.  I am not involved with that.  They will give you directions in terms of how to do it. Parenthetically, that can be done either in person or virtual; the process is exactly the same.  And that's essentially what my, sort of, auto text is.

Q    Okay.  And, Dr. Bardey, did Dr. Green conduct some sort of secret test on Mr. Guerriero?

A    No.

Q    What was Dr. Green's role in the examination?

A    She played the role of assistant.  So she was not there -- she took notes because my handwriting is pretty much illegible and I find it that I -- I'd rather have the -- the eye to eye contact and know that someone

in my office is taking detailed notes.  Because she's a clinician, she was able to raise a -- a question that I think was appropriate.  Because she's a clinician, when she was able to review with me some of the materials, I knew that she could understand it.  And therefore, when I wrote my report and asked her to review it, in -- in other words, to ask her if she was in agreement and would add her signature, she answered in the affirmative.

Q   Okay.  Thank you.  And as we discussed earlier today, your office issued a report on November 24th, 2025, in this, case that both you and Dr. Green signed.

A   Correct.

Q   Who wrote that report?

A   I did.

Q   Okay.  Do you intend to testify to all of the opinions presented in the report?

A   I do.

Q   Okay.  Are all of your opinions contained within this report?

A   Yes.

Q   Did you review Dr. Liebert's report in this matter?

A   Yes.

Q   Do your opinions address the substance of her

report?

A     Yes.

Q     Do you agree with the substance of her report?

A     No.

Q     Okay.  Does your report address the substance of those disagreements in your opinion?

A     They're reflected in the opinion.  They're not specifically discussed as part of my opinion.

Q     But just to be clear, Dr. Bardey, your opinions that you view -- the substance of your opinions that you've stated are in conflict with Dr. Liebert.  The substance of those opinions are in your report; is that correct?

A     Yes.

MR. HEROD:  Okay.  Thank you.  That's all I have.

THE WITNESS:  Okay.

MR. LYONS:  Okay.  We -- I have nothing.

THE PROCEEDING OFFICER:  All right.

Mr. Wolf, do you have anything?

MR. WOLF:  We have -- no, we're -- we have no further questions.

THE PROCEEDING OFFICER:  All right.  No problem.  Mr. Wolf, the transcript is included with your order.  Can I confirm you'd like it produced?

MR. WOLF:  Yes, I would.  And can you get me a -- we'll pay the extra fee to expedited if you can get us one expedited.

THE PROCEEDING OFFICER:  Okay.  What date do you need it expedited by?

MR. WOLF:  Well, what makes your -- what's reasonable for you without making your life too rough?

THE PROCEEDING OFFICER:  It's -- it -- honestly, it doesn't matter, anything after today.  So --

MR. WOLF:  Oh, yeah.  Listen, how about -- how about, you know, Wednesday or Thursday?

THE PROCEEDING OFFICER:  Okay.  I can do Wednesday the 1st or Thursday the 2nd.  You tell me which day works for you.

MR. WOLF:  If Thursday will make it easier on you, that's fine.

THE PROCEEDING OFFICER:  All right.  So it's Thursday the 2nd for expedite.

Mr. Herod, would you be purchasing a copy of the transcript?

MR. HEROD:  We will.  We'll take Thursday as well.

THE PROCEEDING OFFICER:  Okay.

And, Mr. Lyons, will you be purchasing a copy of the transcript?

MR. LYONS:  No.  No, thank you.

THE PROCEEDING OFFICER:  All right. Thank you.  And we are off the record at 11:34 a.m.

(Deposition concluded at 11:34 a.m.)

* * * * *

CERTIFICATE OF PROCEEDINGS OFFICER

I, DANA ALARCON, hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the proceedings were recorded by me and thereafter formatted into a full, true, and correct transcript of same;

I further certify that I am neither counsel for nor related to any parties to said action, nor in any way interested in the outcome thereof.

DATED, this 2nd day of April, 2026.

_____

DANA ALARCON, Certification # CER HH-601380

Proceedings Officer